MONTGOMERY COUNTY BOARD OF COMMISSIONERS, APPELLANT, *v.*
PUBLIC UTILITIES COMMISSION OF OHIO ET AL., APPELLEES.
(Two cases.)

[Cite as Montgomery Cty. Bd. of Commrs. *v.* Pub. Util. Comm. (1986), 28 Ohio St. 3d 171.]

(Nos. 86-26 and 86-651—Decided December 30, 1986.)

*Lee C. Falke,* prosecuting attorney, and *Janine L. Migden,* for appellant in case Nos. 86-26 and 86-651.

*Anthony J. Celebrezze, Jr.,* attorney general, *Robert S. Tongren* and *James B. Gainer,* for appellee in case Nos. 86-26 and 86-651.

*James J. Mayer, Squire, Sanders & Dempsey, Alan P. Buchmann* and *Richard W. McLaren, Jr.,* for intervening appellee Cincinnati Gas & Electric Co. in case No. 86-26.

*Edward N. Rizer,* for intervening appellee Dayton Power & Light Co. in case No. 86-651.

*Bell, Randazzo & Bentine Co., L.P.A., Langdon D. Bell* and *Judith Brick Sanders,* urging reversal for *amicus curiae,* Industrial Energy Consumers Group, in case No. 86-26.

*Andrew Boyko,* law director, *Stephen P. Bond* and *James L. Harkins, Jr.,* urging reversal for *amicus curiae,* city of Parma, Ohio, in case No. 86-651.

DOUGLAS, J. Pursuant to its emergency powers under R.C. 4909.16, the PUCO created the PIP plan as a response to growing concern "about the number of residential gas * * * [and] electric customers unable to obtain service as a result of disconnection for nonpayment of bills because of the economic recession, increases in the cost of gas and electric service, and a decrease in the level of governmental assistance * * *." PUCO No. 83-303-GE-COI, *supra,* at 1. The PUCO's exercise of this emergency authority was appealed to this court in a number of cases.[3] These appeals were summarily dismissed upon motion of the PUCO which asserted that the quasi-legislative nature of its decisions was not properly subject to judicial review. In addition, it is the opinion of this court that it is clearly within the PUCO's emergency powers under R.C. 4909.16 to fashion such relief as that provided by the PIP plan and we find the plan of the commission to be manifestly fair and reasonable as a solution to the crisis.

In the same order creating the PIP plan, the PUCO acknowledged that while it was "* * * foreclosing one method by which a utility may exercise its rights to collect * * *" unpaid utility bills, to wit: service disconnection, the utility would still have "* * * available to it all of its other remedies of law * * *" including its ability "* * * to recoup its bad debts through a rate case as provided in Chapter 4909 Revised Code.* * *" *Id.* at 14. The issue raised by this case, however, is whether the emergency powers extant in R.C. 4909.16 extend so far as to allow the PUCO to authorize recoupment of PIP arrearages through the EFC rate in apparent contravention of the plain meanings of R.C. 4909.191 and 4905.01. Specifically, appellant does not challenge the PUCO's authority to allow the utilities to recoup arrearages caused by the PIP plan. Rather, appellant contends that since such arrearages do not constitute either an

---

[3] *Arlington Natural Gas Co.* v. *Pub. Util. Comm.,* No. 84-188, appeal dismissed April 5, 1984; *East Ohio Gas Co.* v. *Pub. Util. Comm.,* No. 84-422, appeal dismissed April 5, 1984; *Columbia Gas* v. *Pub. Util. Comm.,* No. 84-459, appeal dismissed April 5, 1984.

acquisition or delivery cost as set forth in the preceding statutes, they may not lawfully be recovered through the EFC rate.

R.C. 4909.191(C) provides that "[t]he electric light company shall demonstrate at the hearing on its fuel component that its *acquisition* and *delivery* costs were fair, just, and reasonable.* * *" (Emphasis added.) The term "fuel component" as used in the phrase "electric fuel component rate" is defined in R.C. 4905.01(G):

" 'Fuel component' means *acquisition* and *delivery* costs of fuel for the generation of electricity, including the allowable costs of purchased power as defined in section 4909.159 of the Revised Code * * *." (Emphasis added.)

R.C. 4905.01 further defines "delivery cost" and "acquisition cost" as:

"(E) 'Delivery cost' means the cost of delivery of fuel, to be used for the generation of electricity, from the site of production directly to the site of an electric generating facility.

"(F) 'Acquisition cost' means the cost to an electric light company of acquiring fuel for generation of electricity.* * *"

Appellant argues that the precise language of these statutory provisions preclude the PUCO from permitting a utility to recapture its PIP arrearages in an EFC adjustment proceeding. We agree.

As a general rule of statutory construction, the specific mention of one thing implies the exclusion of another. *Saslaw* v. *Weiss* (1938), 133 Ohio St. 496, 498 [11 O.O. 185]; *State, ex rel. Boda,* v. *Brown* (1952), 157 Ohio St. 368, 372 [47 O.O. 262]. This principle is especially pertinent where, as in the cases *sub judice,* the statute involved is a definitional provision. Had the General Assembly intended to allow the utilities to recapture other types of expenses through this rate, it would have expanded the definitions. In addition, it is well-settled "* * * that the General Assembly's own construction of its language, as provided by definitions, controls in the application of a statute.* * *" *Ohio Civil Rights Comm.* v. *Parklawn Manor* (1975), 41 Ohio St. 2d 47, 50 [70 O.O.2d 148]. Definitions provided by the General Assembly are to be given great deference in deciding the scope of particular terms. See, also, *Good Samaritan Hospital* v. *Porterfield* (1972), 29 Ohio St. 2d 25, 30 [58 O.O.2d 75]. Moreover, in *Pike Natural Gas Co.* v. *Pub. Util. Comm.* (1981), 68 Ohio St. 2d 181 [22 O.O.3d 410], this court enunciated its belief that policy determinations regarding whether certain costs should be recoverable pursuant to an adjustment clause lie exclusively within the province of the General Assembly. In *Pike,* at 186, we stated:

"In recent years, the desirability of adjustment clauses for utilities has been under debate. Those who favor adjustment clauses have argued that they are necessary because there is a lag between the time costs increase and the time those costs may be recovered through increased rates * * *. Those with a contrary point of view argue that the use of adjustment clauses diminishes utilities' incentive to provide consumers with the least

expensive product. Whether a given adjustment clause, based upon these or other factors, should be adopted is not a question for the commission, or for this court; rather, its resolution lies with the General Assembly.* * *''

Previous to the *Pike* case, this court's decision in *Ohio Power Co.* v. *Pub. Util. Comm.* (1978), 54 Ohio St. 2d 342, 344 [8 O.O.3d 353], stated even more specifically:

''* * * Fuel adjustment clauses are not and may not be permitted to become a carte-blanche authorization to an electric utility to pass through to its tariff customers expenses other than fuel costs fairly attributable to the production of the service to those customers.* * *''

The PUCO is a creature of statute, and may not exercise jurisdiction beyond that conferred by statute. *Dayton Communications Corp.* v. *Pub. Util. Comm.* (1980), 64 Ohio St. 2d 302, 307 [18 O.O. 3d 478]; *Consumers' Counsel* v. *Pub. Util. Comm.* (1981), 67 Ohio St. 2d 153, 166 [21 O.O.3d 96]. As the General Assembly has explicitly set forth its policy regarding the types of costs recoverable through the EFC rate, we hold the Public Utilities Commission of Ohio may not lawfully authorize the recovery of Percentage of Income Payment plan arrearages through the Electric Fuel Component rate.[4]

Appellee also urges that the PUCO may, pursuant to R.C. 4909.191 (C)(5),[5] consider factors other than acquisition and delivery costs in

---

[4] This court is aware of the advantages associated with the recoupment of PIP arrearages on a current basis. As stated in the opinion of the PUCO in case No. 85-285-GA-UNC, at 2:

"The Companies request approval to use the GCR mechanism, rather than a base rate proceeding, to recover PIP arrearages. The Commission agrees that this is a necessary and appropriate means of providing that recovery.

"It was never the Commission's intention to create a cost to the companies which would not be recovered. As evidenced by our Opinion and Order and Entry on Rehearing in Case No. 83-303-GE-COI, the only question was the mechanism for recovery of those costs.

"The most compelling reason to include the PIP arrearages in the GCR mechanism is the ability to reflect future recoveries. Those customers who stay on the plan during the summer months should pay off a portion of their arrearages during that time; some customers may only be on the PIP plan temporarily, and may pay their arrearages in better times. Using the reconciliation adjustment mechanism will permit the recognition of future payments. If the PIP arrearages were included with normal uncollectibles in a base rate proceeding, no adjustments could be made to reflect the pay-backs that the Commission hopes and believes will be made. It is this possibility of pay-backs, and the need for a mechanism to reflect those pay-backs, that differentiates PIP arrearages from a company's regular uncollectibles, and that argues in favor of permitting recovery of PIP arrearages through the GCR mechanism."

Thus, while we cannot condone the recovery of arrearages through the EFC rate in light of the specific statutory language of R.C 4905.01 and 4909.191, we do not express the opinion that the PUCO would be precluded from fashioning an alternative accelerated recovery mechanism which is not contrary to statute, including recovery of arrearages on a more current basis rather than only after a twelve-month delinquency.

[5] R.C. 4909.191(C) reads:

"The electric light company shall demonstrate at the hearing on its fuel component that

establishing the EFC rate. However, this contention lacks merit. Although R.C. 4909.191(C)(5) permits the PUCO to consider "[s]uch other factors as the commission considers appropriate," those "other factors" must, under R.C. 4909.191(C), relate to the commission's determination of whether the electric company's *"acquisition* and *delivery* costs were fair, just and reasonable." (Emphasis added.)

Finally, we are likewise not persuaded by appellee's additional argument that although the PIP arrearages do not constitute either acquisition or delivery costs, the emergency powers delegated to the PUCO under R.C. 4909.16 permit it to fashion any appropriate remedy in response to an emergency situation.[6] In support of this contention, appellee directs this court's attention to *Inland Steel Development Corp.* v. *Pub. Util. Comm.* (1977), 49 Ohio St. 2d 284 [3 O.O.3d 435], and *Akron* v. *Pub. Util. Comm.* (1948), 149 Ohio St. 347 [37 O.O. 39]. In those cases we recognized that the PUCO's discretionary emergency powers include authority to impair contractual provisions as needed to alleviate an emergency, if it bears a real and substantial relation to the health, safety, morals or general welfare of the public, and if it is not unreasonable or arbitrary. Even considering these prior decisions, appellee's arguments do not overcome the fact that the PUCO's order exceeds the legislative mandate as to the types of costs recoverable pursuant to R.C. 4909.191 as defined in R.C. 4905.01.

For the foregoing reasons, we find that the PUCO, in each of the consolidated cases, unlawfully exceeded its authority by authorizing the recoupment of PIP plan arrearages through the EFC rate. Since R.C. 4903.13 mandates that "[a] final order made by the public utilities commission shall be reversed, vacated, or modified by the supreme court on appeal, if, upon consideration of the record, such court is of the opinion that such order was unlawful or unreasonable," the orders of the PUCO

---

its acquisition and delivery costs were fair, just, and reasonable. The public utilities commission shall consider, to the extent applicable, at each hearing on a fuel component:

"(1) The efficiency of the electric light company's fuel procurement practices and policies;

"(2) The results of financial audits;

"(3) The results of performance audits;

"(4) Compliance by the company with previous commission performance recommendations;

"(5) Such other factors as the commission considers appropriate.* * *"

[6] R.C. 4909.16 reads:

"When the public utilities commission deems it necessary to prevent injury to the business or interests of the public or of any public utility of this state in case of any emergency to be judged by the commission, it may temporarily alter, amend, or, with the consent of the public utility concerned, suspend any existing rates, schedules, or order relating to or affecting any public utility or part of any public utility in this state. Rates so made by the commission shall apply to one or more of the public utilities in this state, or to any portion thereof, as is directed by the commission, and shall take effect at such time and remain in force for such length of time as the commission prescribes."

are reversed. Recognizing the potential impact of our decision, we *sua sponte* stay our order for one hundred twenty days from the date of this decision to give the PUCO and/or the Ohio General Assembly time to take whatever action they might deem appropriate.

*Orders reversed.*

CELEBREZZE, C.J., SWEENEY, LOCHER and C. BROWN, JJ., concur.

WRIGHT, J., concurs separately.

HOLMES, J., dissents.

WRIGHT, J., concurring. I agree with the syllabus law announced in this case and with Justice Douglas' incisive analysis of the problem posed by the PUCO's efforts to exert its emergency powers pursuant to R.C. 4909.16 through the Electric Fuel Component rate. I agree that it is most difficult to rationalize the collection of PIP arrearages via the statutory scheme applicable to the EFC rate.

However, I feel it necessary to write separately as the court's opinion could be clearer on the issue of just how the PUCO should implement "* * * an alternative accelerated recovery mechanism which is not contrary to statute, including recovery of arrearages on a more current basis rather than only after a twelve-month delinquency." (See footnote 4 of the majority opinion.) The majority opinion has approved the power of the PUCO pursuant to R.C 4909.16 to fashion the relief provided by the PIP plan. Further, the majority decision has stated that it "* * * is aware of the advantages associated with the recoupment of PIP arrearages on a current basis." *Id.* Obviously, the PIP plan was conceived under the PUCO's emergency powers and implementation thereof flows from that same power. Finally, the decision has granted the PUCO and/or the General Assembly one hundred twenty days from this date to solve the reimbursement problem. I, for one, have no desire to force the PUCO to guess about what course to adopt to the end militated by the majority opinion. I say this because the majority has pronounced the PIP program as "* * * manifestly fair and reasonable as a solution to the crisis." With that said, I do not feel this court should bear the onus of terminating that PIP plan without giving some degree of guidance to the commission in solving the problem.

The time frame granted the PUCO by the majority precludes the inclusion of the PIP arrearages into the respective rate bases of the utilities involved. Therefore, it would appear obvious that the PUCO must forthwith allow or order intervening appellees to recover the arrearages through a surcharge pursuant to law. No other viable course appears to be available under the majority opinion since it makes no sense at all to find that an

emergency exists and not sanction a reaction to that emergency by way of altering rates.[7]

Likewise, it would make little sense for the return of PIP amounts already recovered by the utilities to customers so that these same amounts could be included in a rate case for later re-collection.

_____

[7] This court has repeatedly upheld the commission's broad statutory authority under R.C. 4909.16 to order rate relief in the event of an emergency. See, e.g., *Duff* v. *Pub. Util. Comm.* (1978), 56 Ohio St. 2d 367, 376-377 [10 O.O.3d 493]; *Ohio Manufacturers' Assn.* v. *Pub. Util. Comm.* (1976), 45 Ohio St. 2d 86, 90 [74 O.O.2d 197]; *Inland Steel Development Corp.* v. *Pub. Util. Comm.* (1977), 49 Ohio St. 2d 284, 287-290 [3 O.O.3d 435.].