COMMUNITY MUTUAL INSURANCE COMPANY, APPELLANT, *v.* FABE,
SUPERINTENDENT OF INSURANCE, APPELLEE.

[Cite as Community Mut. Ins. Co. *v.* Fabe (1990), 52 Ohio St. 3d 187.]

(No. 89-171—Submitted April 3, 1990—Decided July 3, 1990.)

188

*Vorys, Sater, Seymour & Pease,*
*John C. Elam, Michael J. Canter,*
*Terry M. Miller* and *James C. Becker,*
for appellant.

Anthony J. Celebrezze, Jr., attorney general, Marc Kleiman; Benesch, Friedlander, Coplan & Aronoff, Orla E. Collier, James F. DeLeone and Thomas E. Berry, for appellee.

Climaco, Climaco, Seminatore, Lefkowitz & Garofoli Co., L.P.A., Kenneth F. Seminatore and Scott B. Schaffer, urging reversal for amicus curiae, Blue Cross & Blue Shield Mutual of Ohio.

Vorys, Sater, Seymour & Pease, William D. Kloss and Algenon L. Marbley, urging reversal for amicus curiae, Ohio Insurance Institute.

Per Curiam. This case requires us to determine the degree of discretion afforded appellee, the Superintendent of Insurance, in approving or disapproving a rate increase filing under R.C. 3923.021. For the reasons that follow, we hold that absent evidence that the rates were not calculated in accordance with sound actuarial principles, the Superintendent must find that the benefits provided are not unreasonable in relation to the premium charged, and he must approve the rate increase.

Before discussing the proper application of R.C. 3923.021, however, we must dispose of CMIC's claim that the court of appeals ought to have granted CMIC's motion to dismiss the Superintendent's appeal.

First, CMIC argues that the court of appeals lacked subject matter jurisdiction to hear the Superintendent's appeal because the appeal did not raise "* * * questions of law relating to the constitutionality, construction, or interpretation of statutes and rules of the agency, * * *" as R.C. 119.12 requires. Only when the appeal raises such a question of law may an appellate court review whether the decision below was "* * * supported by any reliable, probative, and substantial evidence in the entire record." R.C. 119.12; Miller v. Dept. of Indus. Relations (1985), 17 Ohio St. 3d 226, 17 OBR 466, 479 N.E. 2d 254. CMIC maintains that the trial court confined its opinion to a review of the evidence alone, thus precluding the Superintendent's subsequent appeal.

We agree with the court of appeals that the trial court considered the proper construction of R.C. 3923.021, as CMIC urged it to do in its trial brief. The trial court interpreted the statute to limit the Superintendent's discretion to consideration of whether the rate request was prepared within sound actuarial principles. Since construction of a statute is one of the questions of law upon which an agency appeal may be based, the court of appeals correctly denied the motion to dismiss on this ground.

Second, CMIC contends that the court of appeals lacked jurisdiction over the Superintendent's appeal because CMIC had already begun implementing the higher premium rates at issue before the Superintendent filed his notice of appeal with the court of appeals. CMIC concludes that no justiciable controversy remained for the court of appeals to decide.

In support of this premise, CMIC cites R.C. 3923.02, which provides in part that "* * * no policy of sickness and accident insurance shall be delivered, issued for delivery, or used in this state * * * until a copy of the form of such policy * * * and of the premium rates * * * has been filed with the superintendent of insurance. * * *" (Emphasis added.) Because CMIC began using the new rates by billing insureds immediately after the trial court ruled in its favor, CMIC argues that the case immediately became moot. The quoted portion of R.C. 3923.02 has no relevance to this issue, however, because the language

quoted does not concern approval of rate increases, nor does it confer any rights on insurers who file policies. Instead, the quoted language merely requires insurers to file policies with the Superintendent. Were we to adopt CMIC's position that mere implementation of new rates strips an appellate court of jurisdiction, we would render the appellate process meaningless.

The Superintendent obtained a stay of the trial court's order from the court of appeals, his motion for a stay having been denied by the trial court. App. R. 7(A). When modified, the stay allowed CMIC to implement the rates subject to a refund if the Superintendent won his appeal. The stay protected the interests of both parties, and the refund provision prevented the appeal from being rendered moot. CMIC cites a number of cases in support of the principle that a court should not hear an appeal if the appellee's lawful accomplishment of the event the appellant wished to prevent has rendered the case moot. See, *e.g.*, *State, ex rel. Bd. of Trustees,* v. *Davis* (1982), 2 Ohio St. 3d 108, 2 OBR 658, 443 N.E. 2d 166; *Travis* v. *Pub. Util. Comm.* (1931), 123 Ohio St. 355, 175 N.E. 586; *Pontiac Motor Div., General Motors Corp.* v. *Motor Vehicle Dealers Bd.* (Sept. 15, 1987), Franklin App. No. 87AP-48, unreported. These cases are inapposite here because in *none* of them did the appellant obtain a stay of execution of the lower court's order. In *Pontiac,* the court of appeals dismissed the appeal as moot, but observed that "* * * [h]ad Nassief [the appellant] timely obtained a stay from the common pleas court, a decision by this court on the merits of the case may well have dictated a different result. * * *" The Superintendent filed a motion for a stay of execution in this case a mere eight days after the trial court reversed his order. When the trial court denied the stay, the Superintendent obtained a stay from the court of appeals a couple of days later. Clearly the Superintendent's effort to stay the execution of the trial court's judgment was timely. The case is not moot, and we affirm the court of appeals' refusal to dismiss for lack of jurisdiction.

Turning now to the merits, we must decide how much discretion R.C. 3923.021 confers on the Superintendent in approving or disapproving rate increases for nongroup health and accident policies. R.C. 3923.021 provides in pertinent part:

"(B) With respect to any filing, made pursuant to section 3923.02 of the Revised Code, of any premium rates for any individual policy of sickness and accident insurance or for any indorsement or rider pertaining thereto, the superintendent of insurance may, within thirty days after filing:

"* * *

"(2) Set a date for a public hearing to commence no later than forty days after the filing. The superintendent shall give the insurer making the filing twenty days' written notice of the hearing and shall give such public notice as he considers appropriate. *The superintendent,* within twenty days after the commencement of a hearing, *shall issue a written order,* a copy of which shall be mailed to the insurer that has made the filing, *either approving such filing if he finds that the benefits provided are not unreasonable in relation to the premium charged, or disapproving such filing if he finds that the benefits provided are unreasonable in relation to the premium charged.* This division does not apply to any insurer organized or transacting the business of insurance under Chapter 3907. or 3909. of the Revised Code." (Emphasis added.)

R.C. 3923.021(A) defines the

phrase "benefits provided are not unreasonable in relation to the premium charged":

"As used in this section, 'benefits provided are not unreasonable in relation to the premium charged' means the rates were calculated in accordance with sound actuarial principles."

CMIC contends that because there was no evidence in the record that the proposed rate increase was not "calculated in accordance with sound actuarial principles," the Superintendent was obliged to approve the proposed rate increase. The Superintendent argues, and the court of appeals agreed, that even though the ODI's own expert actuary, Flieschacker, conceded in the Tillinghast report and at the hearing that the rates were calculated in accordance with sound actuarial principles, the statutory standard of reasonableness in R.C. 3923.021(B) allows the Superintendent to exercise his discretion in deciding whether to approve the proposed increase.

The Superintendent asserts that R.C. 3923.021(B)(2) states the precise standard for disapproval of a rate filing, i.e., "that the benefits provided are unreasonable in relation to the premium charged." The Tillinghast report took exception to the calculation of the CMIC rate increase in a number of areas, amounting to a ten-percent reduction in the proposed increase. The Superintendent based his finding of unreasonableness, and his decision to disapprove the filing, on these exceptions.

The Superintendent would have us read R.C. 3923.021(A) not as a definition, but as providing further meaning to the reasonableness standard of subsection (B). He argues that to read R.C. 3923.021(A) as restricting the meaning of "benefits provided are not unreasonable in relation to the premium charged" would be to supplant the reasonableness standard of subsection (B) with a much narrower standard that was never meant to be a standard at all, but rather a kind of elaboration or additional comment on the reasonableness standard of subsection (B).

This attempt to downplay R.C. 3923.021(A) through a non-textual approach to defining same is not convincing. The use of the word "means" in subsection (A) expresses the legislature's intent that the phrase "calculated in accordance with sound actuarial principles" be synonymous with the reasonableness standard of (B). In *Montgomery Cty. Bd. of Commrs.* v. *Pub. Util. Comm.* (1986), 28 Ohio St. 3d 171, 175, 28 OBR 262, 266, 503 N.E. 2d 167, 170, we took a textual approach to the Revised Code and observed that "[d]efinitions provided by the General Assembly are to be given great deference in deciding the scope of particular terms. * * *" In this case the scope of the reasonableness standard is co-extensive with "calculated in accordance with sound actuarial principles." See *Ohio Civil Rights Comm.* v. *Parklawn Manor* (1975), 41 Ohio St. 2d 47, 70 O.O. 2d 148, 322 N.E. 2d 642.

We would stress that our conclusion that the Superintendent's assessment of the reasonableness of benefits in relation to premiums is limited to a determination of whether the proposed rates were calculated according to sound actuarial principles is consistent with the legislative history of R.C. 3923.021. Until recently, nongroup health insurance was provided by health insurance companies, whose rate increases were and are subject to R.C. 3923.021, and by hospital service associations, whose rate increases were subject to former R.C. 1739.051.

R.C. 1739.051 was a cost-contain-

ment measure that required hospital service associations to demonstrate, among other things, that they had made a good faith effort to control hospital costs in order for the Superintendent to approve a premium increase. 138 Ohio Laws, Part I, 499, 528-529. The Superintendent could disapprove a rate increase if he found it to be other than "lawful, fair and reasonable * * *." R.C. 1739.051(D). R.C. 1739.01(L) defined a "lawful, fair and reasonable" rate as one that is "in accordance with sound actuarial principles" *and* that "reflects a good faith effort * * * to control costs * * *." 138 Ohio Laws, Part I, 527. R.C. Chapter 1739 was repealed in its entirety in 1987 by Sub. S.B. No. 124. 142 Ohio Laws, Part I, 330. This bill made companies such as CMIC, which were changing over from hospital service associations to mutual insurance organizations, subject to R.C. 3923.021 when they sought rate increases on nongroup health and accident policies. *Id.* In addition, Sub. S.B. No. 124 amended R.C. 3923.021 by adding present subsections (A) and (D). 142 Ohio Laws, Part I, 373-374.

The court of appeals accepted the Superintendent's contention that the reasonableness standard of R.C. 3923.021(B) was not affected when that statute was amended to add current subsection (A). The court reasoned that the requirement of subsection (A) that the rates comport with sound actuarial principles was carried over from R.C. 1739.01(L), where it was not the sole standard for rate increase approval. Thus the court concluded that sound actuarial principles are not the sole criterion now. We disagree. By adding subsection (A) in 1987, the General Assembly unambiguously evinced its intention to explain and restrict the reasonableness standard of R.C. 3923.021(B). When it did so, the legislature substantially

narrowed the scope of the Superintendent's discretion in evaluating nongroup rate increase requests.

The General Assembly took the opportunity in enacting Sub. S.B. No. 124 to state in precise terms the exact meaning of the R.C. 3923.021(B) reasonableness standard. That standard, that the rates be calculated in accordance with sound actuarial principles, is the one we must follow. Accordingly, if the proposed rate increase meets that standard, the Superintendent has no authority to object to it in the name of reasonableness.

Because the record discloses no testimony by any of the expert witnesses that CMIC's August 8, 1988 rate filing was *not* calculated in accordance with sound actuarial principles, the trial court was correct in holding that the Superintendent's order was not supported by reliable, probative, and substantial evidence. R.C. 119.12; see *Miller, supra,* at 227, 17 OBR at 466-467, 479 N.E. 2d at 256.

The court of appeals correctly held that it had subject matter jurisdiction over the Superintendent's appeal. We reverse the court of appeals on the issue of the scope of the Superintendent's discretion in disapproving rate increases under R.C. 3923.021 and reinstate the judgment of the trial court.

*Judgment affirmed in part
and reversed in part.*

MOYER, C.J., SWEENEY, DOUGLAS, WRIGHT, BRYANT and RESNICK, JJ., concur.

HOLMES, J., dissents.

THOMAS F. BRYANT, J., of the Third Appellate District, sitting for H. BROWN, J.

HOLMES, J., dissenting. I must

respectfully dissent from the judgment of the majority, which ties the hands of the Superintendent of Insurance, strips him of all discretion in approving or disapproving individual sickness and accident policy rates, and shifts such discretion to one or more actuaries or accountants. The so-called "textual approach" by which the majority reaches this result is unduly narrow, and fails to take into account the entire "text" of Sub. S.B. No. 124, contrary to well established principles of statutory construction and the specific legislative history of Sub. S.B. No. 124.

The Superintendent does *not* take a "non-textual" approach to defining the phrase "benefits provided are unreasonable in relation to the premium charged," as used in R.C. 3923.021(B). Rather, he argues that this phrase is fully defined *in various terms* and in *various places* within R.C. Chapter 3923; *i.e.,* in R.C. 3923.021(A) *and* 3923.33(E) and (K).

It cannot be denied, and the majority has so stated, that R.C. 3923.021(A) defines the operative phrase here *solely* in terms of whether "the rates were calculated in accordance with sound actuarial principles." It is also clear from the legislative history, as explained by the majority, that "reasonable" rates are no longer defined, *as a general matter,* in terms of whether they reflect "a good faith effort * * * to control costs," since the repeal of former R.C. 1739.01(L) by Sub. S.B. No. 124. I thus concur in the majority's conclusion that the general cost containment analysis undertaken as a prerequisite to the Superintendent's finding policy rates to be reasonable was not carried over from former R.C. Chapter 1739 into current R.C. 3923.021.

The analysis does not end at this point, however. R.C. 3923.021 is a general law applicable "to *any* filing, made pursuant to section 3923.02 of the Revised Code, of *any* premium rates for *any* individual policy of sickness and accident insurance * * *." (Emphasis added.) The Superintendent points out that the *specific* provisions of R.C. Chapter 3923 relevant to Medicare supplement policies of the type filed by appellant here, R.C. 3923.33, set forth *specific* requirements for the Superintendent to consider in determining whether such policies "return to policyholders benefits that are reasonable in relation to the premium charged." These requirements are contained within R.C. 3923.33(E) and (K), and rules promulgated thereunder. Those statutory sections provide as follows:

"(E) Medicare supplement policies shall be expected to return to policyholders benefits that are reasonable in relation to the premium charged. The superintendent shall adopt rules to establish minimum standards for loss ratios of medicare supplement policies on the basis of incurred claims experience and earned premiums for the entire period for which rates are computed to provide coverage and in accordance with accepted actuarial principles and practices. * * *

"* * *

"(K) The superintendent shall promulgate such additional rules as are necessary in order to meet the requirements set forth in subsection (c) of Public Law 96-265, 42 U.S.C. 1395ss, as amended for federal certification of state regulatory standards."[1]

The court of appeals correctly construed these requirements, stating:

"Loss ratio standards

"Medicare supplement policies shall be

---

[1] One such rule, relevant here, is Ohio Adm. Code 3901-1-41(G), which provides:

"It is clear that the foregoing provisions set forth *minimum* standards which must be met by insurers seeking to market Medicare supplemental insurance policies in Ohio. These sections do not require the superintendent to approve any policy or rate filing that meets these standards, but rather sets forth the standard which must be met as a condition for approval. For example, a given rate may be actuarially sound, but nevertheless unreasonable if it fails to meet the prescribed loss ratio. This construction finds further support in Subchapter XVIII of the Social Security Act regarding supplemental Medicare health insurance policies. See Sections 1395ss(b)(1) and (c), Title 42, U.S. Code."[2]

The specific provisions of R.C. 3923.33 conflict with a literal reading of R.C. 3923.021(A), as the former statute requires the Superintendent to promulgate rules ensuring that all Medicare supplemental policies comply with federal law, and *in addition,* are calculated "in accordance with accepted actuarial principles and practices."

Given this obvious conflict, it is a fundamental rule of statutory construction that statutes *in pari materia, i.e.,* relating to the same or similar subject matter, shall be read together as if they were a single statute, and construed and applied to render their contents operative and valid, so as to accomplish the manifest purpose of their enactment and give full force and effect to the legislative intent. *Cochrel* v. *Robinson* (1925), 113 Ohio St. 526, 149 N.E. 871, paragraph four of the syllabus; *Trotwood Trailers, Inc.* v. *Evatt* (1943), 142 Ohio St. 197, 27 O.O. 168, 51 N.E. 2d 645, paragraph one of the syllabus; *Meeks* v. *Papadopulos* (1980), 62 Ohio St. 2d 187, 16 O.O. 3d 212, 404 N.E. 2d 159.

"It is a settled rule of construction, that the intention of the lawmaker is to be deduced from a view of the whole, and every part of the enactment, taken and compared together. He must be presumed to have intended to be consistent with himself throughout, and at the same time to have intended effect to be given to each and every part of the law. And from this it results, that general language found in one part, is to be modified and restricted in its application, when it would otherwise conflict with specific provisions found in another; and this from the reasonable and almost irresistible conclusion, that when the mind is directed to any particular subject, the language used is

---

expected to return to policyholders in the form of aggregate benefits under the policy, as estimated for the entire period for which rates are computed to provide coverage, on the basis of incurred claims experience and earned premiums for such period and in accordance with accepted actuarial principles and practices:

"* * *

"(2) At least sixty per cent of the aggregate of premium collected in the case of individual policies."

[2] Federal law requires all Medicare supplemental policies "to return to policyholders in the form of aggregate benefits

provided under the policy, at least 75 percent of the aggregate amount of premiums collected in the case of group policies and at least 60 percent of the aggregate amount of premiums collected in the case of individual policies." Section 1395ss(c)(2), Title 42, U.S. Code. Unless a state regulatory program includes requirements "equal to or more stringent than the requirements described in subparagraphs (2) and (3) of subsection (c)," as does Ohio's program, such state will lose its primacy over certification enforcement of Medicare supplemental policies. See Section 1395ss (b)(1)(B), Title 42, U.S. Code.

more likely to express the intention than general words which might otherwise cover it, but from which it does not appear that the particular case was intended to be provided for." *State, ex rel. Commrs. of Knox Cty.*, v. *Blake* (1853), 2 Ohio St. 147, 151. See, also, R.C. 1.47(B).

The general language contained in R.C. 3923.021(A), although clear, must be restricted in its application when it conflicts with the specific provisions of R.C. 3923.33(E) and (K), *supra*.

"The legislature * * * is presumed to have intended a just and reasonable result, feasible of execution." *Radcliffe* v. *Artromick Internatl., Inc.* (1987), 31 Ohio St. 3d 40, 43, 31 OBR 148, 151, 508 N.E. 2d 953, 956; R.C. 1.47(C) and (D). Where, as here, an insurer files a Medicare supplemental insurance policy with the Superintendent for his approval, R.C. 3923.33(E), (K), and the rules promulgated thereunder require the Superintendent to determine whether the rates contained therein (1) were calculated in accordance with sound actuarial principles and practices, and (2) are in compliance with both the Superintendent's loss ratio standards and federal law. To hold, as has the majority today, that the general provisions of R.C. 3923.021(A) and (B), exclusively, govern the Superintendent's conduct does violence to the General Assembly's intent in enacting the whole of Sub. S.B. No. 124. Therefore, I dissent.