WATERVILLE GAS COMPANY, Appellant,

v.

MASON, Appellee.

[Cite as *Waterville Gas Co. v. Mason* (1994), 93 Ohio App.3d 798.]

Court of Appeals of Ohio,
Lucas County.

No. L-93-133.

Decided March 31, 1994.

*Renisa A. Dorner,* for appellant.

HANDWORK, Judge.

This case began in April 1992 when appellant, Waterville Gas Company, filed a complaint in the Maumee Municipal Court against appellee, Judith H. Mason, seeking a judgment in its favor for an arrearage owed on appellee's gas bill. Appellee filed an answer and cross-complaint. She raised an affirmative defense asserting that because she had complied with all the requirements for a payment in proportion to income program ("PIP"), as set forth in Ohio Adm.Code 4901:1–18–04, appellant was precluded from pursuing a judgment for any arrearage accrued on her gas bill. In addition, she sought relief for alleged arbitrary, capricious and discriminatory behavior on the part of appellant. Appellant filed an answer to the cross-complaint, denying the allegations and stating that the PIP plan did not prohibit the collection of delinquent amounts owed on a customer's gas bills; rather, PIP prohibits the gas company from turning off the customer's gas to collect the arrearage.

On January 26, 1993, a bench trial was held. Following the bench trial, the court filed a judgment entry in which appellant's motion to dismiss appellee's cross-complaint was granted. Appellant and appellee were directed to submit post-trial memoranda to the court regarding appellant's motion for judgment on its claim.

On April 13, 1993, the trial court filed a judgment entry and memorandum on the decision. The court granted appellant judgment in the amount of $32.79, the amount of one month's PIP payment owed by appellee, against appellee with interest at a rate of ten percent per annum from January 11, 1993. Appellant brought this appeal, and raises three assignments of error for consideration. The assignments of error are:

"I. The trial court erred when it held that the arrearages owed to a utility company by a customer are not due and payable while the customer remains on the Percentage of Income Payment Plan.

"II. The trial court erred when it held that the imposition of late charges constitutes a waiver of timely payments.

"III. The trial court erred when it held that the recovery of total arrearages would frustrate the public policy embodied in the Ohio Revised Code and PUCO rules."

Appellee did not file a brief in this court.

Because they are interrelated, we will consider the first and third assignments of error together. Appellant argues, under these assignments of error, that the trial judge erred as a matter of law, and as a matter of public policy, when he ruled that appellant could not file a collection suit and could not obtain a judgment for arrearages owed by a residential customer who is still a participant in the PIP plan. In support of its arguments, appellant refers this court to two statements.

The first statement appears in a pamphlet prepared by the PUCO. The pamphlet contains the most commonly asked questions about the PIP plan and answers prepared by PUCO staff members about the questions. The statement in the pamphlet upon which appellant relies is:

"11. May the company sue the customer for his or her arrearages?

"Yes, the arrearages are a legal debt. The company may use any standard means of collection after a judgment such as the garnishment of wages or the placing of a lien on the customer's property. The company may also turn the debt over to a collection agency. The company may *not* disconnect service to correct the arrearage as long as the customer remains current on the plan." (Emphasis *sic.*) Percentage of Income Payment Plan (PIP) 1990–1991 Questions & Answers.

The second statement appears in an opinion and order issued by the PUCO, entitled *In the Matter of the Investigation into Long–Term Solutions Concerning Disconnection of Gas and Electric Service in Winter Emergencies.* The statement is as follows:

"The Commission has adopted this year-round percentage of income payment plan for very practical reasons. We are not willing to stand by while others, too poor to pay for utility service during the winter, freeze. At the same time, we are ever mindful of protecting the vast majority of customers of utilities under our jurisdiction who pay their bills in full from responsibility for greatly increasing uncollectibles. We have in this proceeding looked at such alternatives to the percentage of income plan as maintaining the status quo, extending payment plans from six months to twelve or more months, and having another moratorium. All things considered, the percentage of income plan adopted by the Commission

today will do the most to assist those in need to maintain utility service while protecting the companies' remaining rate payers.

"Contrary to the argument of those who oppose the percentage of income payment plan, the plan adopted by the Commission is supported by the evidence of record, does not constitute income redistribution, and is reasonable and lawful. This plan does not constitute income redistribution because those customers who qualify for the plan are still liable for any arrearages on their bills. There is no debt forgiveness. The Commission is just foreclosing one method by which a utility may exercise its right to collect for the debt. The utility still has available to it all of its other remedies at law. Because the customer is still liable for his/her arrearages, the Commission's percent of income payment plan does not constitute free service or a rebate as charged by opponents to the plan. The plan is not confiscatory. After the plan is in effect the utility will be able, as it has always been able, to recoup its bad debts through a rate case as provided in Chapter 4909 Revised Code, nor does the plan adopted by the Commission unlawfully discriminate. All residential consumers similarly situated can take advantage of this plan. The policy of this Commission to prevent those without the present ability to pay their utility bills from freezing is a valid state purpose and is the basis upon which the Commission has established this plan. We believe it to be a rational basis." *In the Matter of the Investigation into Long–Term Solutions Concerning Disconnection of Gas and Electric Service in Winter Emergencies,* case No. 83–303–GE–COI, PUCO Opinion and Order.

Appellant argues that the above-quoted statements from the PUCO clearly show that the PUCO has authorized utility companies to file collection suits and to obtain judgment for arrearages owed by PIP customers even while the customers are still enrolled in and participating in the PIP program. Appellant made the same arguments at trial in this case. The trial judge rejected the arguments after making a careful analysis of the statutes that enabled the PUCO to promulgate the PIP plan and of the Administrative Code provisions that constitute the PIP plan. The trial judge stated:

"A unique feature of PIP *vis-a-vis* all of the other extended payment and budget plans set out in OAC Section 4901:1–18–04 is that, so long as the customer remains current in his or her PIP payments, there is no time limit set out in the Code when the accrued charges, in excess of PIP payments, must be paid to the utility company. Since the non-winter payments usually are not sufficient to satisfy all of the gas usage charges accruing during the winter months, an unpaid balance is likely to develop and carry over from year to year.

" * * *

"The Ohio Assembly, by its enabling statutes Sections 4933.12 and 4933.122 Revised Code, and the PUCO, by its rules set forth in OAC Sections 4901:1–18–

01 through .10 have, in fact, changed the time when the payment for gas becomes due *and payable* for those participating in extended payment plans.

"This is particularly so with the PIP plan. While arrearages accrue and vacillate throughout the winter and non-winter periods of the year, and become charges *owed* to the utility, they are not due *and payable in toto* until some event occurs rendering the balance of the arrearages so payable. Until that point in time arrives, a PIP customer receives his/her supply of natural gas, pays for it in accordance with PIP payment schedule [*sic* ], based on federal guidelines, and the utility cannot refuse to furnish gas to the customer. This arrangement can be likened to a revolving open account payable on an installment basis, with no credit limit." (Emphasis *sic*.)

Like the trial judge, this court has conducted a thorough review of R.C. 4933.12 and 4933.122 and of Ohio Adm.Code 4901:1–18–01 *et seq.* In addition, we have reviewed case law to see whether the specific issue now presented on appeal has previously been considered and decided by Ohio courts. We conclude that this is a case of first impression.[1] We also conclude, for the following reasons, that the decision rendered by the trial judge was not in error.

The legislature of Ohio has specified that generally a utility company which delivers gas to a customer can terminate delivery of gas if the customer fails to pay the amount owed for the gas delivered. R.C. 4933.12(A). However, the legislature of Ohio has established some exceptions to the general rule; the exceptions prohibit the termination of gas delivery to a customer who is more than thirty days behind in payments, from November 15 to April 15, unless the utility company complies with extra notification procedures. R.C. 4933.12(C), (D), (E).[2] The legislature has also acted to give extra protection to residential

---

**1.** The Second District Court of Appeals of Ohio considered a case filed by an electric company seeking an arrearage from a customer who had been on the PIP plan when the arrearage accrued. *Dayton Power & Light Co. v. Barnes* (Feb. 23, 1989), Montgomery App. No. 11223, unreported, 1989 WL 14722. The Second District Court ruled that a collection judgment could be awarded for the amount of the arrearage, but the case is distinguishable from the case at bar, because the customer in *Dayton Power & Light Co.* was no longer on the PIP plan when the electric company filed suit to correct the arrearage.

**2.** R.C. 4933.12 reads in pertinent part as follows:

"(A) Except as provided in division (C) of this section and division (E) of section 5117.11 of the Revised Code, if any person supplied with gas neglects or refuses to pay the amount due for such gas or for rent of articles hired by him from a natural gas company or a gas company, the company may stop the gas from entering the premises of such person.
" * * * *
"(C) The company shall not, for any reason, unless required by the consumer, for safety reasons, or unless tampering with utility company equipment or theft of gas or utility company equipment has occurred, stop gas from entering the premises of any residential

customers from termination of utility services, R.C. 4933.122, and has directed the PUCO to "hold hearings and adopt rules to carry out" mandates in the law, including a mandate that extended payment plans be made available to customers who can demonstrate an inability to "pay for such service in accordance with the requirements of the utility's billing except under an extended payment plan." R.C. 4933.122(C).[3]

The PUCO, following the directive of the legislature, has adopted rules which establish the extended payment program known as PIP. The express

---

consumer for the period beginning on the fifteenth day of November and ending on the fifteenth day of the following April, unless both of the following apply:

"(1) The account of the consumer is in arrears thirty days or more;

"(2) Where the occupant of a residential premises is a tenant whose landlord is responsible for payment for the service provided by the company, the company has, five days previously, notified the occupant of its intent to discontinue service to him.

"(D) No company shall stop the gas from entering any residential premises between the fifteenth day of November and the fifteenth day of April because of a failure to pay the amount due for such gas unless the company, at the time it sends or delivers to the premises notices of the termination, informs the occupant of the premises where to obtain state and federal aid for payment of utility bills and for home weatherization and information on local government aid for payment of utility bills and for home weatherization.

"(E) On or before the first day of November, a county human services department may request a company to give prior notification of any residential service terminations to occur during the period beginning on the fifteenth day of November immediately following the department's request and ending on the fifteenth day of the following April. If a department makes such a written request, at least twenty-four hours before the company terminates services to a residential customer in the county during that period for failure to pay the amount due for service, the company shall provide written notice to the department of the residential customer whose service the company so intends to terminate. No company that has received such a request shall terminate such service during that period unless it has provided the notice required under this division."

3. R.C. 4933.122 reads:

"No natural gas, gas, or electric light company shall terminate service, except for safety reasons or upon the request of the customer, at any time to a residential consumer, except pursuant to procedures that provide for all of the following:

"(A) Reasonable prior notice is given to such consumer, including notice of rights and remedies, and no due date shall be established, after which a customer's account is considered to be in arrears if unpaid, that is less than fourteen days after the mailing of the billing. This limitation does not apply to charges to customers that receive service pursuant to an arrangement authorized by section 4905.31 of the Revised Code, nor to electric light companies operated not for profit or public utilities that are owned or operated by a municipal corporation.

"(B) A reasonable opportunity is given to dispute the reasons for such termination;

"(C) In circumstances upon which termination of service to a consumer would be especially dangerous to health, as determined by the public utilities commission, or make the operation of necessary medical or life-supporting equipment impossible or impractical, and such consumer establishes that he is unable to pay for such service in accordance with the requirements of the utility's billing except under an extended payment plan.

"Such procedures shall take into account the need to include reasonable provisions for elderly and handicapped consumers.

"The commission shall hold hearings and adopt rules to carry out this section."

purpose of the plan is to prevent utilities from discontinuing service during the winter months, leaving low-income individuals with no heat. *Montgomery Cty. Bd. of Commrs. v. Pub. Util. Comm.* (1986), 28 Ohio St.3d 171, 171–172, 28 OBR 262, 263, 503 N.E.2d 167, 168. Under PIP, customers who demonstrate their eligibility for the plan are allowed to make fixed monthly payments, which represent a percentage of their household income, to utility companies which provide either a primary or a secondary source of heat in the customer's home. The actual bill for the amount of energy (gas or electricity) used by the customer may far exceed the amount of the PIP payment made by the customer. The excess amount of the utility bill that was not paid by the PIP payment continues to be owed by the customer, and becomes an arrearage on that customer's bill. Ohio Adm.Code 4901:1–18–04. The actual bill for the amount of energy used by the customer may also be lower than the amount the customer pays under the PIP plan; in that instance the excess amount paid is applied toward any arrearage which has accrued. *Montgomery Cty. Bd. of Commrs. v. Pub. Util. Comm.,* 28 Ohio St.3d at 176, 28 OBR at 266–267, 503 N.E.2d at 171, fn. 4. This court agrees with the assessment of the trial judge in this case, that the plan is designed to operate like a "revolving open account payable on an installment basis, with no credit limit."

The Supreme Court of Ohio has ruled:

"The General Assembly will not be presumed to have intended to enact a law producing unreasonable or absurd consequences. It is the duty of courts, if the language of a statute fairly permits or unless restrained by the clear language thereof, so to construe the statute as to avoid such a result." *State ex rel. Cooper v. Savord* (1950), 153 Ohio St. 367, 41 O.O. 396, 92 N.E.2d 390, paragraph one of the syllabus.

Keeping this maxim in mind, this court has no choice but to find that R.C. 4933.12 and 4933.122 prohibit a collection action and judgment in favor of a utility company for the amount of an arrearage accrued by a customer who is eligible for and participating in the PIP plan. Any other interpretation would lead to an absurd result; the legislature would be acting to protect low-income utility customers from loss of heat during the winter, by authorizing reduced immediate payments for the utility services provided through special contracts between those customers and the utilities, but would still be leaving those same customers vulnerable to collection actions designed to force the customers to make full, rather than reduced, immediate payments. If appellant's argument were adopted as this court's ruling, this court would be agreeing, in essence, that no reduced payment plan exists at all, because the customer would still be subject to making full payment, even while enrolled in the program, through the attachment of whatever assets that customer might possess. The contract for reduced immedi-

ate payments, based upon a percentage of the customer's net income, would be rendered meaningless, because the utility company could circumvent the protection afforded the customer under the contract by bringing a collection action against the customer, even though the customer was in strict compliance with the PIP contract terms. The customer could be rendered homeless through execution of judgment liens, and would be subject to the very thing the legislature originally acted to prevent: being exposed to the winter weather with no heat.

The statements from the PUCO, upon which appellant relies, are not binding in this court because:

"The PUCO is a creature of statute, and may not exercise jurisdiction beyond that conferred by statute." *Montgomery Cty. Bd. of Commrs. v. Pub. Util. Comm.*, 28 Ohio St.3d at 176, 28 OBR at 266, 503 N.E.2d at 171.

The Supreme Court of Ohio has already struck down a plan, initially approved by the PUCO, for collecting PIP arrearages through increased electric fuel component rates, because the plan exceeded the scope of the definition for costs which the legislature indicated could be recovered by increased electric fuel component rates. *Id.* at the syllabus. Furthermore, this court is not persuaded that the statements of the PUCO, upon which appellant relies, include the contemplation that collection actions against PIP customers for arrearages can be pursued while the customer is still enrolled in PIP. Other statements made by the PUCO, and by the Supreme Court of Ohio, indicate that PIP arrearages are not collectible in full until the customer is no longer participating in PIP. See *id.* at 176, 28 OBR at 266–267, 503 N.E.2d at 171, fn. 4.

The *Montgomery Cty. Bd. of Commrs. v. Pub. Util. Comm.* court did not directly address the issue we now consider in the case at bar, but it did make some statements which are instructive. The *Montgomery Cty. Bd. of Commrs. v. Pub. Util. Comm.* court quoted a statement issued by the PUCO that indicated that arrearages accrued by a PIP customer cannot be treated the same as other "bad debts" owed to utility companies. *Id.* at 176, 28 OBR at 266–267, 503 N.E.2d at 171, fn. 4. The PUCO statement quoted by the Ohio Supreme Court was as follows:

" 'It was never the Commission's intention to create a cost to the companies which would not be recovered. As evidenced by our Opinion and Order and Entry on Rehearing in Case No. 83–303–GE–COI, the only question was the mechanism for recovery of those costs.

" 'The most compelling reason to include the PIP arrearages in the GCR [gas cost recovery] mechanism is the ability to reflect future recoveries. Those customers who stay on the plan during the summer months should pay off a portion of their arrearages during that time; some customers may only be on the

PIP plan temporarily, and may pay their arrearages in better times. Using the reconciliation adjustment mechanism will permit the recognition of future payments. If the PIP arrearages were included with normal uncollectibles in a base rate proceeding, no adjustments could be made to reflect the pay-backs that the Commission hopes and believes will be made. It is this possibility of pay-backs, and the need for a mechanism to reflect those pay-backs, that differentiates PIP arrearages from a company's regular uncollectibles, and that argues in favor of permitting recovery of PIP arrearages through the GCR mechanism.'" *Id.* (quoting PUCO Opinion, case No. 85–285–GA–UNC, at 2).

The Supreme Court of Ohio then stated:

"Thus, while we cannot condone the recovery of arrearages through the EFC rate in light of the specific statutory language of R.C. 4905.01 and 4909.191, we do not express the opinion that the PUCO would be precluded from fashioning an alternative accelerated recovery mechanism which is not contrary to statute, including recovery of arrearages on a more current basis rather than only after a twelve-month delinquency." *Montgomery Cty. Bd. of Commrs. v. Pub. Util. Comm.,* 28 Ohio St.3d at 176, 28 OBR at 267, 503 N.E.2d at 171, fn. 4.

The above-quoted statements from the PUCO and from the Supreme Court of Ohio show that both the PUCO and the Supreme Court of Ohio contemplate the PIP plan as providing a running arrearage for PIP customers. The arrearage will be paid back, in part, during the summer months through regular PIP payments, and will eventually be paid back in full, once the customer becomes more financially able to pay. No indication is made by either the PUCO or the Supreme Court of Ohio that utility companies may collect the full amount of the arrearage from the customer while the customer is still participating in the PIP plan. Accordingly, we conclude that the trial court did not err, either as a matter of law or as a matter of public policy, when it ruled that appellant is not entitled to a judgment for the arrearage owed by appellee until appellee is no longer participating in the PIP plan. Appellant's first and third assignments of error are not well taken.

■ We now consider the second assignment of error raised by appellant. Appellant makes the following, cursory argument in support of the second assignment of error:

"The [trial] court has also made a rather blanket statement that the Appellant's past acceptance of late payments with an imposition of a ten percent (10%) late charge constitutes a waiver of timely payments. Not only was this not an issue in the underlying action but is [*sic* ] against Ohio law and the manifest weight of the evidence. The court provides no authority for this finding and has further overstepped its boundaries."

Appellant makes no citation to authority to support its argument.

Our review of the ruling questioned by appellant under this assignment of error shows that appellant has misconstrued the ruling. The trial court noted that the evidence presented at trial showed that appellee had not made the $32.79 PIP payment due in January 1993, and that the payment was overdue. The trial court correctly noted that:

"The issue then becomes whether or not such default obligates the defendant at this time (A) to pay damages (i) for the total arrearages amounting to $1,666.71 or (ii) for the unpaid current January 1993 billing of $32.79; or (B) to pay no damages other than the imposition of a 10% penalty."

The trial court then concluded that the default entitled appellant to recover only the amount of the missed monthly payment, $32.79, because: (1) Ohio Adm.Code 4901:1–18–05 creates an option of curing a default in PIP payments by paying the unpaid installments due; (2) appellant's policy of accepting late payments after imposing a ten percent late payment penalty creates a pattern of waiving timely payment requirements, and triggers a requirement of advance notice of a change in policy before a late payment can be construed to justify an action for a breach of contract where the total amount of arrearages is sought; and (3) public policy prohibits a ruling under a restitution theory that total arrearages can be recovered because of one late PIP payment.

▮ The issue presented by the trial court was raised by the evidence presented at trial, and by appellee's defense. The trial court followed well-accepted equity law when it ruled that continual acceptance of late payments constitutes a waiver or equitable estoppel. See *White Co. v. Canton Transp. Co.* (1936), 131 Ohio St. 190, 198, 5 O.O. 548, 551, 2 N.E.2d 501, 504–505. In addition, even if the trial court's ruling that a waiver had occurred was in error, the error is harmless, because two other bases for the ruling that appellant was entitled to recover only $32.79 existed, and neither of those bases has been challenged on appeal. Appellant's second assignment of error is not well taken.

The judgment of the Maumee Municipal Court is affirmed. Appellant is ordered to pay the costs of this appeal.

*Judgment affirmed.*

MELVIN L. RESNICK, J., concurs.

ABOOD, P.J., dissents.

ABOOD, Presiding Judge, dissenting.

I, regretfully, disagree with both the analysis and the result set forth by the majority. Upon review of R.C. 4933.12, R.C. 4933.122, Ohio Adm.Code 4901:1–

18–04, and the related case law, I find nothing to support the interpretation that either statute "prohibit[s] a collection action and judgment in favor of a utility company for the amount of an arrearage accrued by a customer who is eligible for and participating in the PIP plan." I disagree further that allowing a utility company to obtain a judgment for accumulated arrearages on past due payments while requiring it to continue the utility service to the customer is an "absurd result." Rather, such a result, in addition to being what is provided for by the clear language of the statutes, would be of some benefit to all consumers while providing a measure of protection to those who are unable to pay from having their utility service terminated. As honorable as it may be, I believe that the analysis and result of the majority, although it should be, is simply not provided for by law.

I would reverse the judgment of the trial court.