816 A.2d 126

**INSURANCE COMMISSIONER OF the STATE of Maryland,**

v.

**CAREFIRST OF MARYLAND, INC., et al.**

No. 2378, Sept. Term, 2001.

Court of Special Appeals of Maryland.

Feb. 10, 2003.

Randolph Stuart Sergent, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellant.

David M. Funk (James F. Taylor, on the brief), Baltimore, for appellees.

Argued Before ADKINS, ROBERT L. KARWACKI (Retired, Specially Assigned) and WILLIAM W. WENNER (Retired, Specially Assigned), JJ.

ADKINS, J.

In this case, two non-profit health insurers seek to limit the scope of the authority held by the Maryland Insurance Commissioner (the "IC") to regulate insurance rates proposed by them. Appellees CareFirst of Maryland, Inc. ("CareFirst") and Group Hospitalization & Medical Services, Inc. ("GHMSI")(together referred to as "the insurers") challenge the IC's right to venture outside strict actuarial concerns (1) in deciding to disapprove the insurers' proposed rate increases as excessive, and (2) in treating as income the benefit of a subsidy or discount earned by the insurers because they were

willing to offer certain open enrollment insurance known as "SAAC products" to high risk individuals. The insurers also challenge the method that the IC used to set new rates after he disapproved the rates they proposed. We hold that the IC acted within his authority, both in disapproving the rate increases requested by the insurers, and in modifying those rates.

## FACTUAL AND LEGAL PROCEEDINGS

The history of a Maryland independent agency known as the Health Services Cost Review Commission ("HSCRC") provides the backdrop to this case. The HSCRC was established by the General Assembly to regulate the rates charged by hospitals and other related institutions. *See Health Svcs. Cost Review Comm'n v. Franklin Square Hosp.*, 280 Md. 233, 234–38, 372 A.2d 1051 (1977). It reviews such rates to determine whether they are reasonable, and if so, approves them. *See* Md.Code (1982, 2000 Repl.Vol., 2002 Cum.Supp.), § 19–211(a)(1), § 19–219 of the Health–General Article.

In 1974, the HSCRC observed that "some practices of major third parties either reduced hospital costs or averted bad debts." At that time, Maryland Blue Cross/Blue Shield, CareFirst's predecessor, offered an "open enrollment" health care policy for individuals, which enabled an applicant to obtain health insurance without regard to his or her health condition. The HSCRC concluded that the availability of such insurance coverage for high risk individuals resulted in a reduction in the amount of uncompensated or "bad debt" care that hospitals would otherwise have been required to provide if those high risk individuals had not been able to obtain insurance.

In order to encourage other insurers to offer such open enrollment coverage, the HSCRC developed the "SAAC" program. The acronym "SAAC" stands for "Substantial, Available, and Affordable Coverage." Under this program, any insurer who offers a product meeting the SAAC criteria is entitled to a 4% discount from HSCRC-approved hospital rates for the services that Maryland hospitals provide to its

subscribers.[1] The amount of this discount, known as the "SAAC differential," was "designed to reflect the cost savings to hospitals by carriers offering ... SAAC." Once an insurer qualifies for the SAAC differential, the 4% discount applies, not only when health services are provided to those patients purchasing the qualified insurer's SAAC product, but also when services are provided to other persons insured by that carrier under non-SAAC policies. A carrier is required to apply for the SAAC differential each year, and, in doing so, to demonstrate that it meets the criteria specified by the HSCRC. *See* COMAR 10.37.10.26A(6).

Interestingly, the cost savings to the hospitals from having SAAC insurance available dramatically exceeded the loss that the insurers incurred in providing insurance to these high-risk individuals. Because the 4% discount was predicated on the hospital's savings resulting from SAAC coverage, rather than the cost to the insurers, the latter received a large "profit" from the SAAC differential. According to a 2001 HSCRC staff report, the value of the SAAC differential to CareFirst was $26,089,900 in 2000, and was projected to be $27,000,000 for the year 2001. The value of the SAAC differential to GHMSI was $4,600,190 in 2000, and was projected to be $4,900,000 for the year 2001.

In 2001, the General Assembly, recognizing this differential, funded a Short–Term Prescription Drug Subsidy Plan by requiring each insurer receiving the SAAC differential to contribute 37.5% of the discount to the Plan. *See* 2001 Md. Laws ch. 135; *codified at* Md.Code (1997, 2002 Repl.Vol., 2002 Cum.Supp.), § 15–606(c) of the Insurance Article ("Ins."). With a 37.5% reduction, the net SAAC differential still avail-

---

1. Before setting the 4% discount, the HSCRC performed an extensive study to determine what the cost savings were to the hospitals. The HSCRC issued regulations granting the SAAC differential to any carrier that provides an "open enrollment" period during which an individual or family "may purchase health insurance coverage without medical underwriting at a standard, affordable price." *See* COMAR 10.37.10.26A(3). Each year a carrier must apply for the SAAC differential and demonstrate that it meets the criteria specified by the HSCRC. *See* COMAR 10.37.10.26A(6).

able to CareFirst would be $16,875,000 for 2001. The net SAAC differential still available to GHMSI would be $3,062,500 for 2001.[2]

The dispute in this case arose when the IC took the SAAC differential into consideration in disapproving the insurers' proposals to increase premiums for their SAAC products. Rates charged by a non-profit health insurer to its subscribers must first be "submitted to and approved by the" IC. *See* Md.Code (1997, 2002 Repl.Vol.), § 14–126(a) of the Insurance Article ("Ins.") After evaluating a proposed change in rates, the IC "shall disapprove or modify the proposed [rate] change" whenever, *inter alia,* "the table of rates appears by statistical analysis and reasonable assumptions to be excessive in relation to benefits[.]" Ins. § 14–126(b)(3)(i).

On March 9, 2001, the insurers submitted to the Maryland Insurance Administration ("MIA") new rate filings that contained substantial rate increases for certain SAAC products. In support, the insurers provided extensive actuarial information relating to the costs and expenses of the SAAC products. According to these filings, the insurers proposed two contracts, the first to existing SAAC subscribers, with the same level of benefits that had been provided in the past ("the old SAAC product"). The second was offered to new subscribers after June 1, 2001 ("the new SAAC product"), which contained additional benefits required by the Maryland Health Care Commission. All new subscribers would be required to purchase the new SAAC product, which contained more benefits and carried a higher premium.

Under the new scheme, the proposed monthly rates increased as the age of the insured increased, a practice known as "age banding." Depending on the age of the insured, the increases for new CareFirst SAAC customers ranged from 65% to 578%. The rate changes for new GHMSI SAAC customers ranged from a 5.7% decrease to a 270% increase.

---

**2.** *See also* 2000 Md. Laws ch. 565 (creating short term plan and requiring insurers to fund it with $5.4 million from the SAAC differential).

The following percentages of increase were proposed by the insurers:

**EXISTING [CAREFIRST] SAAC PRODUCT**

| | Current | New | Increase Over Existing SAAC Rates | |
|---|---|---|---|---|
| | | | $ | % |
| 25 | $131 | $197 | $66 | 50.4% |
| 35 | $131 | $197 | $66 | 50.4% |
| 45 | $131 | $197 | $66 | 50.4% |
| 55 | $131 | $197 | $66 | 50.4% |
| 65 | $131 | $197 | $66 | 50.4% |

**NEW [CAREFIRST] SAAC PRODUCT WITH AGE BANDING**

| | Current | New | Increase Over Existing SAAC Rates | |
|---|---|---|---|---|
| | | | $ | % |
| 25 | — | $217 | $ 86 | 65.6% |
| 35 | — | $266 | $135 | 103.1% |
| 45 | — | $396 | $265 | 202.3% |
| 55 | — | $622 | $491 | 374.8% |
| 65 | — | $889 | $758 | 578.6% |

**EXISTING [GHMSI] SAAC PRODUCT**

| | Current | New | Increase Over Existing SAAC Rates | |
|---|---|---|---|---|
| | | | $ | % |
| 25 | $210 | $316 | $106 | 50.5% |
| 35 | $210 | $316 | $106 | 50.5% |
| 45 | $210 | $316 | $106 | 50.5% |
| 55 | $210 | $316 | $106 | 50.5% |
| 65 | $210 | $316 | $106 | 50.5% |

**NEW [GHMSI] SAAC PRODUCT WITH AGE BANDING**

| | Current | New | Increase Over Existing SAAC Rates |
|---|---|---|---|

| | | $ | | % |
|---|---|---|---|---|
| 25 | — | $198 | ($ 12) | –5.7% |
| 35 | — | $242 | $ 32 | 15.2% |
| 45 | — | $397 | $187 | 89.0% |
| 55 | — | $496 | $286 | 136.2% |
| 65 | — | $778 | $568 | 270.5% |

On April 13, 2001, the MIA disapproved the requested rate changes. In rejecting the proposed rates, the MIA "determined that the proposed rates were excessive in relation to the benefits provided, considering the value received by [the insurers.]" At the insurers' request, a hearing was held before the IC, Steven B. Larsen.

The insurers' actuary testified that, under the rate schedules proposed by the insurers, the premium revenues would be less than the expected expenses and cost of claims. Thus, the actuary said, the "losses" to the insurers would be even greater under the lower rates approved by the MIA. He calculated that under the rates approved by the MIA, CareFirst would suffer a "loss" of $1,400,000 on SAAC contracts in 2001, while GHMSI would suffer a "loss" of $2,100,000. In his calculations, however, the insurers' actuary did not include the value to the insurers of the SAAC differential generated by the 4% discount that would be applied to its non-SAAC insureds. Once the value of the SAAC differential was accounted for, the losses on the SAAC policies disappeared, because the SAAC differential greatly exceeded the amount of the "losses" as the actuary had calculated them.

At the hearing before the IC, the statistical data was not in dispute. Rather, the insurers challenged the IC's authority to consider the SAAC differential in reviewing the SAAC rates. They presented the testimony of Harold Cohen, who was the Executive Director of the HSCRC from 1972 to 1987. Cohen explained the development of the SAAC differential and opined that "the proper application of cost savings realized as

a result of SAAC should be left to either the [HSCRC] or the Maryland General Assembly."

Cohen's testimony, however, was contradicted by the HSCRC's February 1986 29–page Final Decision that was issued while Cohen was Executive Director (the "Final Decision"). In this Final Decision, the HSCRC set forth the final amount of the SAAC discount, expressly concluded that it was the job of the IC, and not that of the HSCRC, to consider the amount of the SAAC differential in setting insurance rates, and expressly recommended that the IC "consider whether premium adjustment should be made."

In this document, the HSCRC discussed the purposes of the SAAC program, and recognized that "[i]t would not be equitable ... for Blue Cross to charge higher rates that more than cover the claims of this class of insured *and* receive a differential for providing this coverage. This practice amounts to a double reward." (Emphasis in original.) The Final Decision also recognized that the SAAC differential may give an "excessive competitive advantage" to the insurers who receive it, by allowing them to lower the price of all their products rather than lowering only the price of the SAAC product. In the Final Decision, the HSCRC expressed its view that

> [i]t is within the authority of the Insurance Commissioner to adjust and/or limit the premiums which Blue Cross/Blue Shield may charge its customers for SAAC policies in order to adjust its ultimate revenue.... The [HSCRC] does not wish to overstep its jurisdictional bounds as it relates to the business of insurance; therefore, it *recommends* that the Insurance Commissioner consider whether premium adjustment should be made.

The IC also heard testimony from Robert Murray, the Executive Director of the HSCRC at the time of the hearing. Murray testified that HSCRC intended that the SAAC differential would subsidize the cost of the SAAC product, and that the HSCRC "want[ed] there to be a subsidy for the product itself to make sure that it remained affordable." In Murray's view, "[t]he differential was applied company-wide under the

expectation that the entire value or a portion of the value of the differential would be transferred to the open enrollment product and the other qualifying products at the time in order to keep these products substantial and affordable."

In a written opinion, the IC upheld the MIA's determination that the requested rate increases were excessive. The IC concluded that the "HSCRC intended the SAAC product to be 'affordable', and that the model for the program was the historical practice of CareFirst of Maryland to offer a product priced at or near the level of medically underwritten products." He concluded that "the record shows a clear recognition by the HSCRC of the ongoing jurisdiction of the MIA to review SAAC rates." Rejecting the insurers' argument that the imbalance between the SAAC differential and the losses sustained by a SAAC carrier ought to be addressed by the HSCRC, the IC determined that the MIA was the agency with the authority to review insurance rates and to determine whether they were "excessive in relation to benefits" under section 14–126 of the Insurance Article. He found that the HSCRC intended that "the MIA should take into consideration the policy underlying the SAAC program and the value of the discount received by a carrier when reviewing the rates of a SAAC product."

The IC also rejected the insurers' argument that the HSCRC's power to disapprove a carrier as a participant in the SAAC program addressed any concerns about affordability of rates for SAAC customers:

It is true that the HSCRC has provided little guidance on what would appear to be a key element of the SAAC program; namely, that the product be affordable. However, the fact that the HSCRC has, from its perspective as a hospital rate regulator, approved the SAAC applications of GHMSI and CareFirst of Maryland in no way trumps the ... statutory authority of the MIA to separately review rates and to consider all relevant factors.... The regulation of SAAC is clearly joint regulation, with each agency charged to oversee those aspects of the program for which it has the requisite expertise.

The insurers appealed the IC's rate decision to the Circuit Court for Baltimore City. The circuit court reversed, holding that the IC had acted outside of his authority in disapproving the insurers' proposed rates. This appeal followed.

## DISCUSSION

Section 14–126 of the Insurance Article, titled "Filings of amendments and rate changes," is the exclusive source of the IC's authority to approve or disapprove rates charged by non-profit insurers. *See The Johns Hopkins Hosp. v. Ins. Comm'r*, 302 Md. 411, 419–20, 488 A.2d 942 (1985). It provides, in pertinent part:

(a) *Approval by Commissioner required.—*

(1) A corporation subject to this subtitle may not amend . . . the terms and provisions of contracts issued or proposed to be issued to subscribers to the plan until the proposed amendments have been submitted to and approved by the Commissioner . . . .

(b) . . . (3)(i) The Commissioner shall disapprove or modify the proposed change if . . . the table of rates appears by statistical analysis and reasonable assumptions to be excessive in relation to benefits . . . .

(ii) In determining whether to disapprove or modify the . . . table of rates, the Commissioner shall consider:

1. past and prospective loss experience within and outside the State;

2. underwriting practice and judgment to the extent appropriate;

3. a reasonable margin for reserve needs;

4. past and prospective expenses, both countrywide and those specifically applicable to the State; and

5. any other relevant factors within and outside the State.

The insurers offer several arguments to support the circuit court's decision to reverse the IC, and in each they invite us to circumscribe the IC's authority under section 14–126. Addressing each argument in turn, we decline this invitation.

## I.

## Insurers' Arguments That the IC Must Limit His Consideration To Statistical Analysis of Actuarial Factors, And That He Exceeded His Authority In Relying On Policy Concerns In Disapproving The Insurers' Proposed Rates

The insurers' primary argument is that the IC exceeded his authority under section 14–126(b)(3)(i)(1) to disapprove rates if "the table of rates appears by statistical analysis and reasonable assumptions to be excessive in relation to benefits[.]" The insurers first assert that the IC failed to exercise this statutory authority because he did not perform any statistical analysis.

### A.

### Statistical Analysis

The insurers contend that the legislature, in using the terminology "statistical analysis" and "reasonable assumptions," "clearly ... intended to limit the [IC] to considering actuarial factors when exercising his power to disapprove rates." The insurers invoke the familiar statutory construction doctrine of *ejusdem generis* to define and limit the broad language in section 14–126(b)(3) allowing the IC to consider "any other relevant factors" in disapproving and modifying the proposed rate changes. Under this doctrine, they assert, the IC's consideration of other factors is limited to items that are similar in nature to the enumerated factors in items 1 though 4 of subsection 14–126(b)(3)(ii), all of which, they contend, are actuarial. *See, e.g., Rucker v. Harford County,* 316 Md. 275, 295, 558 A.2d 399 (1989)(the doctrine of *ejusdem generis* means that when general words in a statute follow the designation of particular things, the general words are construed to include only those things of the same class or general nature as those specifically enumerated). The IC's consideration of the intent and policy of the HSCRC in creating the SAAC differential was not actuarial, they argue, but rather a policy concern that the IC was forbidden to consider.

We shall hold in section II that the doctrine of *ejusdem generis* does not preclude the IC from considering non-actuarial factors pursuant to section 14–126(b). Analysis of that issue is not required yet, however, because we preliminarily conclude that consideration of the SAAC differential is both statistical and actuarial. We reach this conclusion simply by reference to legal and English language dictionaries.

"Statistics" means "the science that deals with the collection, classification, analysis, and interpretation of numerical facts or data, and that, by use of mathematical theories of probability, imposes order and regularity on aggregates of more or less disparate elements." *The Random House Dictionary of the English Language* 1389 (unabr. ed.1973). A "statistic" is defined as "a numerical fact or datum." *Id.* Clearly, the SAAC differential, a concrete and definite dollar figure determined by taking a fraction (4%) of the cost of hospital services to the insurers' subscribers, is statistical information.

*Black's Law Dictionary* defines "actuary" as "[a] statistician who determines the present effects of future contingent events; esp., one who calculates insurance and pension rates on the basis of empirically based tables." *Black's Law Dictionary* 37 (7th ed.1999). *Random House Dictionary* defines "actuary" as "a person who computes premium rates, dividends, risks, etc., according to probabilities based on statistical records." *See Random House Dictionary, supra,* at 15. We have no doubt that data reflecting the amount that the insurers saved in hospital charges because of the SAAC differential is information that can be used in actuarial analysis because it is statistical, is empirically based, relates to the cost of providing SAAC policies, and can be used to predict the amount of subsidy to be received by the insurers in the upcoming year. It relates to the SAAC policies because, indisputably, the insurers would lose the 4% discount from the hospitals if they did not offer the SAAC policies.

That a substantial portion of the SAAC differential is received when non-SAAC subscribers obtain hospital services

does not deprive the SAAC differential of its status as a statistic used in an actuarial analysis. We therefore hold that, in considering the SAAC differential in his decision, the IC used "statistical analysis" within the meaning of section 14–126(b)(3).[3] This conclusion does not necessarily mean that the statistical analysis performed by the IC was free of the policy concerns that appellants consider inappropriate. We turn next to that aspect of the insurers' argument.

## B.

### Policy Concerns

■ The insurers insist that, even if the SAAC differential is statistical and actuarial in nature, the IC could not consider it in deciding that the proposed SAAC rates were excessive because, in doing so, he was making a policy decision, which goes beyond his actuarial role. His policy decision favored the interests of the high risk subscribers by making their premiums lower. We agree with the insurers that the IC took into account the policy decision of the HSCRC to give insurers incentives to offer affordable insurance to high risk individuals. We do not agree that in doing so, he exceeded his authority. We explain.

As the IC points out, "[i]f the insurers stopped offering the SAAC product, they would no longer be eligible for the SAAC differential, and would have to pay the hospital charges that the SAAC differential represents." The IC merely recognized the undisputed causal relationship between the insurers' offering of SAAC differential policies and the insurers' receipt of benefits in the form of a discount. This simple reality reinforces the logic that the SAAC differential should be credited to the SAAC product.

■ Nor is the IC's concern about providing affordable coverage to SAAC subscribers an improper policy consider-

---

**3.** The insurers offer a variation of their "no statistical analysis" argument in the context of their argument that the IC did not consider the proposed rates "in relation to benefits" as required by section 14–126. We address that argument in Section VII, *infra*.

ation outside of his jurisdictional realm. The IC has a legitimate interest in seeing that the insurance provided by non-profit health service plans provides the best insurance at a reasonable cost to the most people. The IC's power to advance this interest is implicit in his authority to disapprove rates if they are "excessive in relation to benefits," and his authority to disapprove insurance forms that are "unjust or unfair." *See* Ins. § 14–126(b)(3)(i)(1)–(2). *See also* 1–3 *Holmes' Appleman on Insurance 2d* § 3.7 (2002)("Rate regulation is designed to generate premium charges that are equitable for each policyholder-insured as well as yield insurers a fair return for the risks undertaken").

When a large economic benefit accrues to the insurers as a result of a state program designed to promote affordable insurance for high risk individual subscribers, it can be considered inequitable to ignore that benefit when calculating rates for those high-risk individuals. This is particularly so when the proposed rates substantially exceed those charged group insurance subscribers.

The Court of Appeals made it clear in *The Johns Hopkins Hosp., Inc. v. Ins. Comm'r*, 302 Md. 411, 488 A.2d 942 (1985), that the insurance commissioner may consider a State policy regarding health care that was established by another agency as a "relevant factor" within the meaning of section 14–126(b)(3). In *Johns Hopkins Hosp.*, the insurance commissioner had approved a form of insurance contract submitted by Blue Cross of Maryland, Inc., that excluded from coverage "high cost" hospitals, as defined in the contract. A number of hospitals challenged this approval, claiming that it was the job of the HSCRC, and not the insurance commissioner, to regulate the rates charged by hospitals. Rejecting this contention, the Court of Appeals broadly interpreted the "any other relevant factors" language of section 14–126(b)(3):

> "In today's complex society it is not possible, nor is it desirable, so to limit the area of concern of one administrative agency that it does not touch upon that of other agencies. It is not only appropriate but in many instances

necessary, in pursuing state policy goals that two or more agencies of State government take action within the ambit of their express powers to accomplish the desired objective. **Certainly, if health care cost containment is State policy, such would be among the 'relevant factors' which the Commissioner is enjoined by [§ 14–126(b)(3)] to consider**.... The Commissioner has not exceeded the scope of his authority nor has he attempted to exercise power and authority delegated to other agencies. In light of the limited judicial role, coordination of the efforts of separate State agencies in seeking to achieve common goals is beyond the responsibility, authority and power of the Court."

*Id.* at 419–20, 488 A.2d 942 (quoting trial court)(emphasis added and citations omitted). The Court's broad interpretation of the "any other factors" language as permitting the insurance commissioner to consider cost containment policies adopted by the HSCRC instructs us that, in this instance, the scope of the IC's inquiry is not as "policy-limited" as the insurers contend.

Here, the IC relied on the historical record of the HSCRC, including its 1986 Final Decision, and the testimony of its Executive Director, Robert Murray.

A review of the entire record does not support the narrow reading of the statute advanced by CareFirst. First, the testimony by the current Executive Director of the HSCRC, as well as the decisions of the HSCRC, confirm that it has been accepted and underst[ood] that the MIA would regulate the rates of SAAC products with consideration of the purpose of the SAAC program as well as the value of the discount to a particular SAAC carrier.... [T]he record shows that the HSCRC intended the SAAC product to be "affordable," and that the model for the program was the historical practice of CareFirst of Maryland to offer a product priced at or near the level of medically underwritten products.

The IC quoted from the HSCRC's 1986 Final Decision:

"[T]here is substantial testimony that [the non-profit insurer] charges two to three times as much for a policy issued

during open enrollment as it does for the same coverage obtained through group or with evidence of insurability. It would not be equitable, the Commission believes, for [this insurer] to charge higher rates that more than cover the claims of this class of insureds *and* receive a differential for providing this coverage. This practice amounts to a double reward."

In relying on administrative decisions of the HSCRC when he considered the SAAC differential to set rates, the IC was not drawing upon the HSCRC's power. He was acting cautiously to ensure that he did not encroach upon the authority of the HSCRC to regulate the SAAC program. We think that one agency has the authority to consider administrative decisions of another agency, and the policy reasons underlying those decisions, in deciding whether and how to exercise its own authority over an overlapping subject matter. *See Johns Hopkins Hosp.*, 302 Md. at 419–20, 488 A.2d 942.

## II.

### The Insurers' *Ejusdem Generis* Argument

The insurers' invocation of the doctrine of *ejusdem generis* does not dissuade us from our view that the IC acted within his authority. This tool of statutory construction is more commonly used to interpret criminal statutes because they must be narrowly construed. *See In re Wallace W.*, 333 Md. 186, 191, 634 A.2d 53 (1993).

"The doctrine ... applies when the following conditions exist: (1) the statute contains an enumeration by specific words; (2) the members of the enumeration suggest a class; (3) the class is not exhausted by the enumeration; (4) a general reference supplementing the enumeration, usually following it; and (5) there is not clearly manifested an intent that the general term be given a broader meaning than the doctrine requires."

*Id.* at 190, 634 A.2d 53 (quoting 2A *Sutherland Stat. Construction* § 47.18, at 200 (5th ed.1992)).

■ " 'It is generally held that the rule of *ejusdem generis* is merely a rule of construction and is only applicable where legislative intent or language expressing that intent is unclear.' " *Id.*(quoting *Sutherland, supra*). "The general words [of the statute] will not be restricted in meaning if upon a consideration of the context and the purpose of the particular statutory provisions as a whole it is clear that the general words were not used in the restrictive sense." *State Dep't of Assessments & Taxation v. Belcher,* 315 Md. 111, 121, 553 A.2d 691 (1989).

The doctrine often has been applied to statutes featuring lists of specific "things." For example, in *In re Wallace W.,* a statute prohibited the unauthorized use of " 'any horse, mare, colt, gelding, mule, ass, sheep, hog, ox or cow, or any carriage, wagon, buggy, cart, boat, craft, vessel, or any other vehicle including motor vehicle as defined in the laws of this State relating to such, or property whatsoever[.]' " *In re Wallace W.,* 333 Md. at 190, 634 A.2d 53 (citation omitted). A juvenile was adjudged delinquent for violating this statute by taking money from a classmate's purse. The Court of Appeals held that *ejusdem generis* applied because the list created two groups— livestock and vehicles that travel on land or water—and the "other property" mentioned in the statute should be understood to be other property "in the 'same class or general nature' as livestock and land or water vehicles." *Id.* at 191, 634 A.2d 53. It rejected the State's argument that the juvenile's unauthorized use of the money in the purse fell within the statute because that reading would mean that "*all* property would be subject to the unauthorized use statute," contrary to the recognized purpose of the statute to single out "mobile" personal property for special treatment. *See id.* at 193–94, 634 A.2d 53.

In another criminal case, *Choi v. State,* 316 Md. 529, 547, 560 A.2d 1108 (1989), the governing statute made it a misdemeanor " 'to make a false statement, report, or complaint' " to police " 'with intent to cause an investigation or other action to be taken as a result thereof.' " (Citation omitted.) The Court of Appeals held that "or other action" meant an action "of the

same general nature as the initiation of an investigation," and did not mean making a false statement in response to a question from a police officer who was already investigating. *See id.*

The doctrine was applied in a civil licensing case in *Linkus v. Md. State Bd. of Heating Ventilation, Air–Conditioning, Refrigeration Contractors,* 114 Md.App. 262, 689 A.2d 1254 (1997). There, the statute permitted the licensing board to deny an application for a license for any one of 11 listed reasons. One of the enumerated reasons was if the applicant " 'willfully or deliberately disregarded and violated building codes, electrical codes, or laws of the State or of any municipality, city, or county of the State[.]' " *Id.* at 275, 689 A.2d 1254 (citation omitted). When the Board denied Linkus' application based on his prior rape conviction, the Court of Appeals applied *ejusdem generis* in holding that "other laws of the State" did not include all criminal laws, but meant laws similar to electrical and building codes. *See id.* at 280–83, 689 A.2d 1254. The Court noted that the purpose of the statute was to ensure that contractors "possess[ed] the technical qualifications necessary competently to install and service HVACR systems." *See id.* at 280, 689 A.2d 1254. The long list of other factors in the statute was consistent with that interpretation.

In *Rucker v. Harford County,* 316 Md. 275, 558 A.2d 399 (1989), another civil case, the statute at issue provided that " '[t]he government of each county shall furnish an office for the sheriff and pay the necessary expenses for telephones, station[ary] and for other purposes[.]' " *Rucker,* 316 Md. at 294, 558 A.2d 399 (citation omitted). The Court of Appeals rejected the Attorney General's argument that "other purposes" included claims for tortious actions by deputy sheriffs. *See id.* at 295–96, 558 A.2d 399. Applying *ejusdem generis* to the statute, the Court held that the statute contemplated only office-related expenses comparable to those listed in the statute, all of which were "necessary for the operation of the sheriff's function." *Id.*

The doctrine often has been rejected. *See, e.g., Wesley Chapel Bluemount Ass'n v. Baltimore County,* 347 Md. 125, 144–47, 699 A.2d 434 (1997)(because State Open Meetings Act applies to " 'a special exception, variance, conditional use, zoning classification, the enforcement of any zoning law or regulation, **or any other zoning matter,**' " Court of Appeals rejected county's argument that Act did not apply to its consideration of development or subdivision matters)(emphasis added and citation omitted); *State Ins. Comm'r v. Nationwide Mut. Ins. Co.,* 241 Md. 108, 115–16, 215 A.2d 749 (1966)(although statute created tax credits for payments made for " 'any premium or income or other taxes, or any fees, fines, penalties, licenses, deposit requirements or other obligations, prohibitions or restrictions[,]' " the phrase "other obligations" was not limited to the specific things in the words preceding it) (citation omitted); *Belcher,* 315 Md. at 121–22, 553 A.2d 691 (statute permitting homeowners to claim tax credit based on taxpayer's gross income defined "gross income" as including " 'the net income received from business, rental, or other endeavors' "; income from "other endeavors" did not mean only operation of a "business" and did include income resulting from management of one's own stock portfolio) (citation omitted).

After considering these and other cases regarding the *ejusdem generis* doctrine, and the purposes of section 14–126, we conclude that *ejusdem generis* should not be applied to limit the term "other relevant factors" to strict actuarial considerations. Most importantly, as we previously discussed, the *Johns Hopkins Hosp.* Court already has given a broader construction to the IC's power, holding that the IC may consider State policies regarding health care set by other agencies as a "relevant factor" in disapproving and modifying rates. *Johns Hopkins Hosp.* teaches us that the legislature did not intend that the enumerations in subsection (b)(3) would preclude the IC from considering State policy regarding health care that was not enumerated in those sections.

Although *ejusdem generis* was not explicitly argued in *Johns Hopkins Hosp.,* reasons for rejecting the doctrine are

readily apparent. First, if the General Assembly had intended that "other relevant factors" included only actuarial factors, it could easily have so stated by using the phrase, "other relevant actuarial factors." Second, the four factors listed in subsection (b)(3)(ii) differ in character from the readily identifiable list of "things" or "persons" featured in many other instances when *ejusdem generis* has been applied. *Cf., e.g., In re Wallace W.*, 333 Md. at 190–91, 634 A.2d 53 (specific nouns itemized different livestock and vehicles). The listed factors are not "concrete" "persons, places, or things" but rather general types of information. Nor is the list long or detailed enough to establish that the legislature was attempting to restrict the IC to considering only "other relevant actuarial information." *Cf. Linkus*, 114 Md.App. at 280–81, 689 A.2d 1254 (list of 11 different findings that justified denial of license application, with no "catchall" category listed.) We found no cases that applied the doctrine to such a short list of generalized information.

## III.

### Insurers' Argument That HSCRC Has Exclusive Authority

Nor are we persuaded by the insurers argument that the HSCRC's authority to deny an insurer's application for the SAAC differential when its SAAC rates are not affordable curtails the IC's right to consider the SAAC differential in disapproving or modifying that insurer's rate proposal. Two agencies may take action within the ambit of their own powers to accomplish the same objective. *See Johns Hopkins Hosp.*, 302 Md. at 419–20, 488 A.2d 942.

In disapproving the proposed rates, the IC acted strictly within the confines of his authority to approve or disapprove rates of non-profit insurers, and did not encroach on the HSCRC's authority to establish hospital rates in doing so. We see no reason why the IC, acting within the scope of his legitimate power to approve insurance rates, cannot further the policy goal of the HSCRC to provide affordable health care to high risk individuals. *See id.* at 419, 488 A.2d

942 (" '[h]is decisions are limited to that which he is directed to do by § [14–126(b)(3)(ii)]' ") (citation omitted); *State Farm Mut. Auto. Ins. Co. v. La. Ins. Rating Comm'n*, 79 So.2d 888, 894 (La.Ct.App.1955) (in setting rates, insurance commissioner could take notice of deceptive advertising regarding premiums, even though Secretary of State had responsibility to enjoin deceptive practices); *In re Rate Filing of Blue Cross Hosp. Svc., Inc.*, 158 W.Va. 725, 214 S.E.2d 339, 344 (W.Va.1975)(although he could not set hospital rates, insurance commissioner could consider the rates charged by hospitals to Blue Cross in his rate approval capacity). We hold that, because the policy decision of the HSCRC related to the cost of health insurance to the insureds, it could be considered by the IC as one of the "other relevant factors" in the IC's exercise of his rate approval authority. *See* Ins. § 14–126(b)(3)(ii)(5).

We do not agree with the insurers that the HSCRC improperly delegated authority over the SAAC differential to the IC. Although the IC considered Murray's testimony regarding the HSCRC's intent to subsidize the cost of the product, and the HSCRC's 1986 Final Decision recommending that the IC consider premium adjustments to accomplish this result, the IC's authority does not rest on this evidence. The IC's authority to consider the SAAC differential derives from the IC's authority under section 14–126(b)(2) to disapprove or modify insurance rates and to consider "any other relevant factors" in doing so, not from the HSCRC.

■■■ Nor are we persuaded by the insurers' argument that the HSCRC's authority to deny an insurer's application for the SAAC differential if its proposed rates are not affordable curtails the IC's authority to consider that insurer's rates, or to take into account the SAAC differential in that consideration. The HSCRC acted within its powers in setting hospital rates to establish and regulate the SAAC differential program, and the IC acted within his powers over insurance premium rates to disapprove a premium proposal that ignored the benefit the insurers received from this program. *See Johns Hopkins Hosp.*, 302 Md. at 419–20, 488 A.2d 942.

## IV.

### Insurers' Out–of–State Cases

The insurers cite a handful of out-of-state cases that they claim "demonstrat[e] that an insurance commissioner's rate-making authority is limited to considering actuarial data and does not extend to public policy considerations unless expressly authorized by statute." *See Blue Cross & Blue Shield of Del., Inc. v. Elliott,* 479 A.2d 843 (Del.Super.Ct.1984); *Med. Malpractice Joint Underwriting Ass'n of Mass. v. Comm'r of Ins.,* 395 Mass. 43, 478 N.E.2d 936 (Mass.1985); *Am. Federated Life Ins. Co. v. Dale,* 701 So.2d 809 (Miss.1997); *N.C. Comm'r of Ins. v. N.C. Rate Bureau,* 350 N.C. 539, 516 S.E.2d 150 (N.C.1999); *Allstate Ins. Co. v. Knutson,* 278 N.W.2d 383 (N.D.1979); *Community Mut. Ins. Co. v. Fabe,* 52 Ohio St.3d 187, 556 N.E.2d 1155 (Ohio, 1990); *Blue Cross Hosp. Plan, Inc. v. Jump,* 44 Ohio St.2d 78, 337 N.E.2d 783 (Ohio, 1975).

To be sure, these cases all enforce limitations on the statutory authority of those insurance commissioners, and strike down actions that exceed such limitations. We have no quarrel with the proposition that insurance commissioners must observe statutory limitations on their authority. But the limitations enforced in the cited cases are not present in the Maryland statutory scheme or in the circumstances presented in this case. In particular, none of these cases address whether an insurance commissioner can consider as part of his ratemaking authority the economic benefit from a subsidy-like program such as the SAAC differential. Consequently, these cases do not dissuade us from our view that the IC acted properly in disapproving the rates proposed by the insurers.

## V.

### Insurers' Argument That IC Improperly Considered The SAAC Differential As A Subsidy

The insurers also attack the IC's analysis as resting on the allegedly faulty premise that the SAAC differential is a subsidy for the SAAC products:

As part of his endeavor to make it appear as though he engaged in a statistical analysis, the Commissioner refers to the value of the SAAC differential as income and as a subsidy, concluding that he is "required to consider all of the income earned by an insurance company as a result of the insurance contracts at issue, and there is no logical reason to distinguish revenue received as a subsidy for a product from revenue received by means of a premium payment."

The insurers insist that the IC is wrong in characterizing the SAAC differential as a subsidy and income, because it is instead a

discount on hospital rates offered by the HSCRC as an incentive for carriers to participate in the HSCRC's substantial, available and affordable coverage program. The value of the differential is based on the amount of hospital bad debt averted by SAAC contracts, and bears absolutely no relationship to the rates charged by insurers or the cost to insurers of offering SAAC contracts.... Although the hospital-rate discount results in a financial benefit to the participating carrier, it is not income and it is not a subsidy.

The insurers' argument elevates terminology over substance. Although the SAAC differential may not be a direct "subsidy" because it comes in the form of a discount, rather than a direct payment,[4] the concept of the SAAC differential is very similar to that of a subsidy. The very structure of the program—discounts in return for offering SAAC products—makes it clear that the HSCRC designed the program with the intent that insurers who offered a SAAC product would

---

4. A "subsidy" is

1. a direct pecuniary aid furnished by a government to a private industrial undertaking, a charity organization, or the like. 2. a sum paid, often in accordance with a treaty, by one government to another to secure some service in return. 3. a grant or contribution of money. *The Random House Dictionary of the English Language* 1417 (unabr. ed.1973). The SAAC differential is not paid to the insurers because it takes the form of a discount, rather than a direct payment. Thus, it may not meet the classic definition of a subsidy.

receive a financial benefit to better enable them to offer the SAAC product at an affordable price. Indeed, the SAAC differential may more properly be characterized as an incentive program, designed to encourage insurers to offer a SAAC product. In our view, however, what is critical is not the terminology, but rather, the fact that the insurers collectively received approximately $30 million in value because they offered insurance for high risk individual subscribers.

The IC properly treated the SAAC differential as an indirect subsidy, and considered it similar to income in comparing the insurers' premium income to its loss experience and its expenses. This was a proper method for determining whether the proposed rates were excessive.

## VI.

### The Insurers' Argument That the IC Did Not Consider The Proposed Premiums In Relation To Benefits

The insurers also focus on the requirement in section 14–126 that the IC, in evaluating whether the proposed rates are excessive, must measure them "in relation to benefits." They argue that "the [IC] did not find the rates to be excessive 'in relation to' the benefits purchased, the [IC] found the rates to be excessive in light of the value derived by a hospital purchaser differential offered by the HSCRC." We think that the insurers, in making this argument, ignore important aspects of the IC's opinion.

The IC quoted the MIA finding that the "proposed rates were excessive in relation to the benefits provided, considering the value received by CareFirst of Maryland and GHMSI from the 4% SAAC discount." In his opinion, he also made it clear that he considered the premium increases to be excessive in relation to the premiums approved at the last filing.

After setting forth the chart showing the premium amounts and percentage increases, broken down by age of the insured, the IC concluded:

The proposed rates would have involved large increases if the existing SAAC enrollees had not been allowed to continue in the old product. For example, under CareFirst of Maryland's proposed rates, a 55 year old single enrollee would have experienced a $491 dollar a month increase, (374%) if forced to purchase the new product.

There is no doubt that the IC was familiar with the terms of the insurance offered, for he must approve every form of insurance that the insurers offer. *See* Ins. § 14–126(b)(3)(i).[5] Discerning the terms of the coverage, therefore, is a matter within his area of expertise. *See In re N.C. Auto. Rate Admin. Office*, 278 N.C. 302, 180 S.E.2d 155, 167 (N.C. 1971)("in making what must be considered in large measure a policy or judgment decision, the Commissioner [has] the benefit of his own continuous study and knowledge of changing conditions"). Given this expertise, for example, we can infer that in deciding that a $491 monthly increase for a 55 year old single enrollee was excessive, the IC was taking into account that cost in relation to the benefits offered under the contract. The same is true of the proposed rates for the other categories shown on the chart set forth in the IC's opinion.

## VII.

### The Insurers' Criticism Of The IC's Methodology In Setting New Rates

 In challenging the IC's methodology for setting new rates, the insurers return to their "no statistical analysis" theme, insisting that the IC acted outside his authority because he engaged in no statistical analysis in setting a new rate. They argue that he "selected a rate increase that he felt was affordable in light of the price of other products in the market." According to the insurers,

---

5. Ins. section 14–126(a) provides that a nonprofit health service plan "may not amend ... the terms and provisions of contracts issued or proposed to be issued to subscribers ... until the proposed plan amendments have been ... approved by the Commissioner[.]"

the sum total of the [IC's] analysis to arrive at the level of premium approved is set forth on page 15 of the Order:

As has been noted there is no guidance in the HSCRC regulations concerning the "affordability" component of the program, and thus the MIA exercised some discretion in determining what rate to approve for the new SAAC product. The decision involved the balancing of affordability concerns, which weigh toward keeping the rates comparable to other "medically underwritten" products, but at the same time ensuring that the SAAC product is not priced so low as to undercut or destabilize other regulated products by attracting not just high risk individuals but healthy ones as well.

This is not a statistical analysis, much less one that compares the rates to the benefits available under the contract. The Commissioner clearly departed from statistics and into the realm of public policy when he decided to disapprove CareFirst's rates based on affordability concerns.

To avoid confusion, we pause here to clarify the difference between this argument and the insurers' previously rejected argument that the IC acted outside his authority[i] and failed to use statistical analysis in determining that the proposed rates were excessive. As we understand it, the instant argument is that the IC, having decided that the rates were excessive, used improper methodology in setting a new rate. We again reject the insurers' argument, however, because the insurers have not met their burden to show that the methodology was improper and because market factors are "other relevant factors." We explain.

Dissatisfied with the analysis performed by the IC in setting the SAAC rates, the insurers call for more statistical analysis. Unfortunately, however, they do not offer suggestions as to what the proper statistical analysis should be. They say only that "[t]he statute requires a comparison of the rates and contract benefits," citing no cases or other authority to explain how that should be done. They criticize the IC because he "found the rates to be excessive in light of" the SAAC

differential, saying that when done properly, "the [IC's] analysis is an actuarial one." Their only explanation of this rather broad assertion appears in a footnote in which they compare the IC's power under section 14–126 to his power when setting rates for products offered by "for profit" insurers:

> The term "excessive" in general ratemaking [principles] means excessive from an actuarial standpoint, even when there is no statutory language directly tying the determination of whether rates are excessive to the contract benefits as in § 14–126. For example, in Maryland's general ratemaking statute the term "excessive" means a rate that is "unreasonably high for the insurance provided." Md.Code Ann., Ins, § 11–306(b). This is typical of the definition of "excessive" found in ratemaking statutes in other jurisdictions, which define excessive rates as those that are unreasonably high for the risk involved or the insurance provided. (Citations omitted.)

This elaboration offers us no edification about the sort of statistical analysis the insurers perceive to be more appropriate under section 14–126.

The only methodology the insurers even remotely suggest for deciding whether rates are excessive in relation to benefits appears in a quote from a leading insurance authority:

> In setting rates, the commissioner generally employs a basic formula for determining the ratio between net premium and expense loading, the two component parts of the premium. This ratio can only be established after determining expense requirements and what constitutes a reasonable profit. The formula applied by the commission must be mathematically sound, and deviations therefrom may only be made when justified.

5 *Couch on Insurance 3d* § 69:13 (1996)(footnotes omitted). The insurers fail to articulate, however, how the IC's analysis falls short of that recommended in *Couch*.

To the extent that the insurers are complaining that the IC did not determine what the expense requirements were, the record refutes that contention. As the passage from the IC's

opinion excerpted below demonstrates, the IC did take into account the expenses and loss experience of the insurers. He also took into account premiums received by the insurers.

It is also fair to infer that, as *Couch* recommends, the IC determined what would be a "reasonable profit" or, in non-profit terms, a reasonable margin for reserve needs. The IC computed the net benefit to the insurers from the SAAC differential over the last several years, after taking into account the losses on the SAAC contracts.

[D]ata from CareFirst and HSCRC show that for the year 2000, the value of the SAAC discount, *i.e.*, the value of the 4% reduction in hospital rates, was approximately $26 million for CareFirst of Maryland, Inc. and $4.6 million for GHMSI. According to the CareFirst of Maryland 2001 SAAC application, in 2000 incurred hospital claims attributable to the 848 SAAC contracts were $1.3 million. CareFirst's testimony was that total medical expenses plus administrative expenses for these 848 contracts were $2.2 million. Taking into account the $1.4 million in premiums collected from the SAAC subscribers, CareFirst of Maryland lost approximately $800,000 on these 848 contracts, but received hospital discounts worth $26 million. For 2001, CareFirst of Maryland projects a loss on both new and old SAAC products of about $1.4 million in 2001 based on the rates approved by the MIA. In 2000, GHMSI collected $2.9 million in premiums from 979 contracts, paid claims and incurred expenses of $4.1 million, for a loss of approximately $1.2 million, but received discounts worth $4.6 million. In 2001 GHMSI losses on the old and new products are expected to be almost $2.1 million.

In summary the MIA disapproved the requested rate increases not because it disagreed that both the existing and new SAAC products had and would continue to lose money, but because any such losses, collectively projected to be about $3.5 million in 2001, were well below the value of the SAAC discount to CareFirst of Maryland and GHMSI, which totals about $30 million.

There is no contention by the insurers that the millions of dollars in benefits from the SAAC differential, combined with the premium revenue, would be even close to offset by the expenses of the SAAC program, even at the lower rates set by the IC. Indeed, aside from their insistence that the SAAC differential cannot be counted by the IC because it is not "a relevant factor," the insurers do not contend that the rates set by the IC deprive them of the ability to either meet expenses or accrue a reasonable margin for reserve needs.

We think it incumbent upon the insurers, when challenging the quasi-legislative action of the IC in setting insurance rates, to show clearly how the IC deviated from his authority. *See Pub. Svc. Comm'n of Md. v. Baltimore Gas & Elec.* Co., 273 Md. 357, 362, 329 A.2d 691 (1974) (because ratemaking is a legislative function, a court will not substitute its judgment for a public service commission "except upon clear and satisfactory evidence that it is unlawful or unreasonable"). *See also Office of People's Counsel v. Md. Pub. Svc. Comm'n,* 355 Md. 1, 31–32, 733 A.2d 996 (1999)(burden is on party challenging public utility ratesetting to show that findings are arbitrary); *In re N.C. Auto. Rate Admin. Office,* 180 S.E.2d at 167 ("in making what must be considered in large measure a policy or judgment decision, the Commissioner [has] the benefit of his own continuous study and knowledge of changing conditions"). In the absence of any showing of what a more statistical analysis would entail, and what the IC failed to do in this case, we hold that the insurers did not meet this burden.

To be sure, the IC did not select a particular profit margin, and determine the new rates based on that margin. As the IC said, his decision in setting the new rates involved the "balancing of affordability concerns, which weigh toward keeping the rates comparable to other 'medically underwritten' products, but at the same time ensuring that the SAAC product is not priced so low as to undercut or destabilize other regulated products by attracting not just high risk individuals but healthy ones as well." This comparison to other rates is the only thing about the IC's methodology that the insurers

identify as objectionable. Ironically, however, the IC's decision to take into account the price of other insurance products resulted in the IC setting the rates for the SAAC products **higher** than he would have set them using traditional methods such as that suggested in *Couch.*

Given the size of the SAAC differential (at least $26 million for CareFirst, and $4.6 million for GHMSI), it is evident from the IC's opinion, and the insurers do not contend otherwise, that if the rate were simply set to insure a reasonable profit margin for the insurers, the SAAC rates would be lower than the IC actually set them. We explain, starting with a review of the standards for setting rates.

As the Supreme Court of North Carolina articulated:

Various standards exist for the making and use of insurance rates.... Three basic principles of law pertain to the setting of insurance rates: (1) the Commissioner must set rates that will produce a fair and reasonable profit and no more; (2) what constitutes a fair and reasonable profit "involves consideration of profits accepted by the investment market as reasonable in business ventures of comparable risk"; and (3) the underwriting business, which includes the collection and investment of premiums, is the only basis for calculating the profit provisions.

*N.C. Rate Bureau,* 516 S.E.2d at 151 (citations omitted).[6] The North Carolina court also explained that,

"[i]n determining whether an insurer has made a reasonable profit, the amount of business done rather than its capital should be considered, and profits should be determined by subtracting losses and expenses from the total of premiums actually received, *to the exclusion of profit on capital and surplus*[.]"

---

**6.** Although these principles were expressed by the North Carolina Supreme Court in the context of for-profit insurers, they are instructive to explain how a commissioner determines what is a "reasonable profit," the concept that *Couch* referred to in the passage quoted by appellees. We also think that the concept of "reasonable in business ventures of comparable risk" is one that can be translated from the profit sector to the non-profit sector.

*Id.* at 153 (quoting *N.C. Comm'r of Ins. v. N.C. Rate Bureau,* 300 N.C. 381, 269 S.E.2d 547, 586 (N.C.1980), and 2 Ronald A. Anderson, *Couch Cyplopedia of Ins. Law* § 21:38, at 494 (2d ed.1959)). The amount of business done is measured by the total premiums actually received. *See id.; see also In re N.C. Fire Ins. Rating Bureau,* 275 N.C. 15, 165 S.E.2d 207, 224 (N.C.1969)(commissioner should determine a fair and reasonable profit based on evidence "as to (1) the reasonably anticipated loss experience during the life of the policies to be issued ..., (2) the reasonably anticipated operating expenses ..., and (3) the percent of Earned Premiums which will constitute a 'fair and reasonable profit'"); *In re N.C. Auto. Rate Admin. Office,* 180 S.E.2d at 164 (reasonableness of profit governed by margin for underwriting profit; 5% margin had been "generally approved in the industry").

The record shows that the insurers received far more than a reasonable profit, or, more accurately in this non-profit context, far more than a reasonable amount to add to reserves. In 2000, CareFirst's total medical expenses and administrative expenses for the SAAC products were $2.2 million. It collected $1.4 million in premiums on those products. If we calculate the value of the SAAC differential based on the figures for CareFirst's costs and expenses through December 31, 2000, which were the most recently available figures when Care-First presented its rate filing to the IC, the SAAC differential was worth at least $26 million.

When that $26 million SAAC differential is reduced by the maximum amount that CareFirst could be obligated to use as funding for the Short–Term Prescription Drug Subsidy Plan, the net SAAC differential, plus premium income, minus expenses, leaves a "balance" for CareFirst to add to its reserve that equals a double-digit multiple of premium income, and therefore grossly exceeds what would be "accepted by the investment market as reasonable in business ventures of comparable risk."[7] *See, e.g., id.* (5% of premium provided a

---

7. It is unclear from the record before us how much of the value of the SAAC differential CareFirst was obligated to use to fund the drug

reasonable and adequate profit); *N.C. Ins. Comm'r v. Att'y Gen.*, 19 N.C.App. 263, 198 S.E.2d 575, 581 (N.C.Ct.App.1973), *cert. denied*, 284 N.C. 252, 200 S.E.2d 659 (N.C.1973)(2.5% of premium income was reasonable as profit allowance); *N.C. Rate Bureau*, 269 S.E.2d at 588 (5% of gross premium for underwriting profit is traditional); *Aetna Ins. Co. v. Hyde*, 315 Mo. 113, 285 S.W. 65, 78 (Mo.1926), *cert. denied*, 275 U.S. 440, 48 S.Ct. 174, 72 L.Ed. 357 (1928)(5% profit on underwriting business with 3% additional for conflagration hazard was reasonable); *Va. Ins. Dep't v. Philadelphia*, 196 Pa.Super. 221, 173 A.2d 811, 824 (Pa.Super.Ct.1961)(allowance of 6% of premiums was customary, reasonable, and recommended by National Association of Insurance Commissioners); *Am. Druggists' Ins. Co. v. Virginia*, 201 Va. 275, 110 S.E.2d 509, 511–12 (Va.1959)(5% underwriting profit was the approved formula in Virginia for 30 years); *Va. State AFL–CIO v. Virginia*, 209 Va. 776, 167 S.E.2d 322, 329 n. 13 (Va.1969)(commission, not actuaries or other experts, "is charged with the responsibility of fixing a 'reasonable margin for underwriting profit and contingencies' "). *See also* Arch T. Allen, III,

---

subsidy plan in 2000. The legislation that took effect on July 1, 2000 required "total contributions ... by all carriers participating in the [SAAC] differential program [to] be $5.4 Million per year." 2000 Md. Laws ch. 565 § 1. We cannot determine from the record how much of the $5.4 million CareFirst was obligated to pay. The 2001 legislation changed the funding requirement, mandating that "[t]he total contributions to be made to the ... Plan by all carriers ... [to] be equal to 37.5 Percent of the value of the differential provided to all carriers that offer [SAAC] coverage[.]" Nevertheless, it is clear that CareFirst would have profits in excess of comparable ventures no matter which of these two funding formulas was in effect.

Assuming that CareFirst paid the entire $5.4 million that the 2000 legislation required from all carriers combined, CareFirst still would have a profit of $19.8 million ($1.4 million in premiums collected, plus $26 million for the SAAC differential, minus $2.2 million for total medical and administrative expenses, minus another $5.4 million for the subsidy). This represents 14 times the collected premiums.

Alternatively, assuming that CareFirst funded the drug subsidy plan at the 37.5% rate that the 2001 legislation required, CareFirst would have a profit of $15.45 million (62.5% of the $26 million SAAC differential is $16.25 million; $16.25 million plus $1.4 million in premiums collected, minus $2.2 million for total medical and administrative expenses). This represents 11 times the collected premiums.

*Insurance Rate Regulation and the Courts: North Carolina's "Battleground" Becomes A "Hornbook,"* 61 N.C. L.Rev. 97 (1982)(discussing cases).[8] Like CareFirst, the return for GHMSI's SAAC products also would be a multiple of premium earnings.

■ In treating the SAAC differential as part of the income earned on the SAAC policies, we recognize that the SAAC differential, because it was a discount on hospital bills for all of the insurers' subscribers, was affected by the volume of non-SAAC policies sold by them. On the other hand, as we have said before, there would be no discount, and the insurers would have been charged the full standard hospital rate, if the insurers had not made SAAC coverage available. More importantly, the SAAC differential program was created to insure the availability of affordable insurance for high risk individual subscribers. Under these circumstances, we consider it logical, reasonable, and within his statutory authority for the IC, in setting rates, to include the SAAC differential in his analysis of the income derived from the SAAC policies.

■ We recognize that, in setting the exact rates, the IC did take into account the market rates of underwritten products. The IC's reason for doing so—his concern that he not create a market situation in which the SAAC rates were more attractive to consumers than the underwritten rates—was a legitimate one. Although market pricing is, in the first instance, the province of the insurance company, section 14–126 gives the IC the authority to modify rates, and thus he becomes the rate-setter. Under these circumstances, the IC was faced with the problem of setting insurance rates in an unusual situation—a subsidy-like benefit to the insurers created an anomaly in the market. Pricing the SAAC product so that those subscribers qualifying for group rates remained as

---

8. Although the cases we have located are all more than a quarter century old, and their profit percentages may be somewhat dated, we have no doubt that more current notions of what constitutes a reasonable profit for health companies, even if higher, still do not approach the multiple of premium income present in this case.

group subscribers, rather than becoming SAAC subscribers, achieved the legitimate goal of normalcy and stability in the insurance market.

## VIII.

### Insurers' Argument That Other Legislation Reflects The General Assembly's Intent That The IC Not Regulate The SAAC Differential

The insurers would have us find that the legislature, in enacting a 2000 statute and defeating a 2002 House Bill, intended that the IC disregard the SAAC differential in his review of rates. For the reasons we explain below, neither of these legislative events persuades us that the General Assembly intended that the IC be precluded from considering the SAAC differential as an "other relevant factor" in his review of rates.

The insurers point out that the General Assembly did not enact any legislation directly relating to the SAAC program until 1997, when it authorized the Maryland Health Care Access And Cost Commission (the "HCC") to develop a uniform set of benefits for SAAC contracts. *See* 1997 Md. Laws ch. 245. In 1999, the General Assembly established the Task Force to Study the Non–Group Health Insurance Market in Maryland (the "Task Force"), to evaluate the SAAC program and make recommendations to the General Assembly. *See* 1999 Md. Laws ch. 602. The Task Force recommended, *inter alia,* that the IC should "[r]equire a SAAC carrier's open enrollment premiums to be *at least* 5% higher than the small group market premiums or benefit-equivalent medically underwritten, individual product premiums[.]" (Emphasis in original.) Legislation codifying the Task Force recommendations with respect to the SAAC program was proposed in 2000; under that legislation, a carrier desiring to issue a SAAC contract would have been required to submit an application for approval by the Commissioner, and to comply with any regulation promulgated by the Commissioner. *See* H.B.

1199, 2000 Leg., Reg. Sess. (Md.2000). The proposed legislation was defeated.

Instead, in 2000, the General Assembly established the Short–Term Prescription Drug Subsidy Plan, funded with a portion of the value of the SAAC differential. *See* 2000 Md. Laws ch. 565. That legislation required carriers receiving the SAAC differential to contribute $5.4 million attributable to the benefits from the differential to a prescription drug plan for Maryland's senior citizens.

In 2001, the General Assembly again enacted legislation concerning the SAAC differential. *See* 2001 Md. Laws ch. 135. The 2001 legislation changed the amount of the contribution to the Short–Term Prescription Drug Subsidy Plan, requiring each carrier to contribute an amount equal to 37.5% of the value of the differential. *See* Ins. § 15–606(c)(2). Also in 2001, the General Assembly (1) required carriers that deny coverage under a medically underwritten plan to provide the individual with information regarding the availability of substantial, available and affordable coverage, and (2) directed the Commissioner to adopt regulations to implement this requirement. *See* 2001 Md. Laws ch. 389, *codified at* Ins. § 15–606.1(c).

The insurers contend that we should read this pattern of legislative action adversely to the IC:

> Through the legislative enactments of the past five years, the General Assembly has taken steps to remove certain portions of SAAC from the exclusive regulatory power of the HSCRC. The General Assembly delegated to the HCC the authority to establish minimum standards for substantial coverage, placed certain notification requirements on carriers participating in SAAC, directed that a portion of the value of the SAAC differential be used to subsidize a prescription drug plan, and rejected an amendment that would have required SAAC rates to be set at a certain level and increased the [IC's] regulatory authority over SAAC contracts. This legislative history amply demonstrates that the General Assembly did not intend for the [IC] to have regulatory authority over the use of the SAAC differential.

The insurers also rely on 2002 legislation, House Bill 1207, which proposed adding language to section 14–126, giving the IC the authority to consider the value of the SAAC differential in setting rates. *See* H.B. 1207, (.3, 2002 Leg., Reg. Sess. (Md.2002)).

We do not find the insurers' legislative history argument persuasive. First, only 37.5% of the differential was diverted to the Short Term Prescription Drug Plan, and as the IC points out, "[e]ven after devoting [this amount], ... the insurers retain the remaining 62.5% of the SAAC differential, in the projected amount for 2001 of $16.9 million for CareFirst and $3.1 million for GHMSI." As the IC readily recognizes, any amount used for the Short Term Prescription Drug Plan could not be considered by the IC as a subsidy to the insurers.

Second, the defeat of House Bill 1207 cannot be read to mean that the General Assembly intended to restrict the scope of the IC's authority. As the IC points out,

> that Bill would have enacted sweeping changes to the governance structure of non-profit health services plans, far beyond any amendments that it would have made to § 14–126. Most significantly, the Bill would have enabled the Governor to appoint eight of seventeen Board members for every Board of Directors of a non-profit health services plan, allowed the Governor to select the Chairman of the Board ..., limited the compensation for the Board and its Chairman, and provided new authority to the Attorney General to seek judicial control over the plan's assets.

We agree that, given the multiple provisions of this defeated bill, we should draw no inference about the General Assembly's intent regarding the IC's authority to consider the SAAC differential in exercising his rate approval and rate setting functions.

## IX.

### Conclusion

For the foregoing reasons, we conclude that the IC acted within his authority, both in disapproving the rates proposed by the insurers, and in modifying those rates.

JUDGMENT OF THE CIRCUIT COURT FOR BALTI-MORE CITY REVERSED; CASE REMANDED TO THE CIRCUIT COURT WITH DIRECTIONS TO ENTER JUDGMENT AFFIRMING THE DECISION OF THE IN-SURANCE COMMISSIONER. COSTS TO BE PAID BY APPELLEES.